In re ELJAY JRS., INC., Debtor.

Bruce S. SCHERLING, Trustee of Eljay Jrs., Inc., Plaintiff,

v.

Joel S. EHRENKRANZ and Andrea Boles Mallas, Executors of the Estate of Louis J. Mallas, Defendants.

Bankruptcy No. 87–B–10094 (HCB). Adv. No. 88–5366A.

United States Bankruptcy Court, S.D. New York.

Oct. 27, 1989.

---

Scherling, Davidson & Rech, P.C., New York City by Gustav Rech, for Trustee.

Skadden, Arps, Slate, Meagher & Flom New York City by Michael Cook, Julie L. Miller, and Kayalyn Marafioti, for Joel S. Ehrenkranz, Co–Executor of the Estate of Louis J. Mallas.

HOWARD C. BUSCHMAN, III,
Bankruptcy Judge.

This adversary proceeding was commenced by Bruce S. Scherling (the "Plaintiff" or the "Trustee"), Chapter 7 trustee of Eljay Jrs., Inc. (the "Debtor" or "Eljay"), against Joel S. Ehrenkranz and Andrea Boles Mallas (the "Defendants"), Co–Executors of the Estate of Louis J. Mallas (the "Mallas Estate"), to avoid, pursuant to §§ 544(b), 547 and 548(a) of 11 U.S.C. (the "Bankruptcy Code" or the "Code"), transfers of insurance proceeds alleged to be property of Debtor, to the Mallas Estate approximately two months prior to the Debtor's filing for relief under the Bankruptcy Code, at a time when it was insolvent.[1] The principal issues are (i) whether an *inter vivos* life insurance trust was established in 1980, when there is no proof of insolvency, having as its *res* the right to collect the proceeds from existing and after acquired policies and (ii) whether, if so, the transfer of the insurance proceeds violated § 513(a) of the New York Business Corporation Law and are therefore avoidable

---

**1.** Accordingly, this adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)

pursuant to § 544(b) of the Code. Trial was held on June 13 and 16, 1989. Post-trial submissions were completed on October 10, 1989.

## I

Eljay is a New York corporation. It was incorporated in 1977. June 16, 1989 Trial Transcript (the "6/16/89 Tr."), pp. 12–13. Louis J. Mallas was a shareholder and officer of the corporation from its inception until his death in 1986. Eljay commenced the business of selling domestically manufactured ladies' garments upon acquiring a division of Lou Mallas, Inc. in exchange for a demand obligation in the principal amount of $2,000,000. 6/16/89 Tr., pp. 12–13.

Eljay obtained from Phoenix Mutual Life Insurance Company of Hartford, Connecticut ("Phoenix") two insurance policies on Mallas' life on June 7, 1977 and September 6, 1977. The policies, Nos. 2,011,175 and 2,021,244, were in the face amounts of $1,500,000 and $500,000, respectively (the "Phoenix Policies"). The Phoenix Policies named Eljay as owner and provided that "[t]he owner controls th[e] polic[ies] while the insured is living." Exh. 12 and Exh. 13, ¶ 3. Eljay retained the rights to receive all amounts payable during the insured's life, to change the beneficiary and the interest of any owner, and to assign, release or surrender the policies. Exh. 12 and Exh. 13, ¶ 3 and ¶ 4.

Beneficiary Designations, dated June 16, 1977 and October 5, 1977 were filed with Phoenix by Eljay in 1977. They stated that the proceeds of the policies would be

> "payable on account of the death of the insured ... to Lou Mallas, Inc., a New York corporation, its successors or assigns, creditor, as such creditor's interest may appear ... The amount payable on account of the death of the insured, less the amount paid as hereinbefore provided, shall be payable to El Jay Jrs., Inc., a

(1984).

New York corporation, its successors or assigns." Exh. 14 and Exh. 15.

Eljay also assigned, by virtue of Assignments of Policy as Collateral dated June 28, 1977 and October 5, 1977 (the "Assignments"), its rights and interests in the Phoenix Policies to Louis Mallas, Inc. Exh. 17 and Exh. 18. It reserved, however, the right to designate and change the beneficiary. Exh. 17 and Exh. 18, ¶ B.

Some three years later, Mallas and his fellow shareholders, Laurence Korman and Lee Blumenthal, and Eljay executed an agreement dated as of May 3, 1980 (the "Agreement," Exh. 1). The Agreement provided, *inter alia*, for Eljay to repurchase shares held by the estate of any deceased shareholder and the estate to sell those shares. Exh. 1, ¶ 1.4. The Agreement further provided that the purchase price of each share of stock of a deceased shareholder was to be the value of each share on the date of the shareholder's death and that the proceeds of any life insurance policies on the life of the deceased shareholder shall be applied to the purchase price. Exh. 1, ¶ 1.8.2(c).

The policy proceeds were to be held in trust to satisfy Eljay's obligation to purchase the shares held by the deceased shareholder and excluded from the calculation of Eljay's net worth. The Agreement further provided for assignment of the proceeds by Eljay if it had not received them when it purchased the stock and for return of that portion of the proceeds if it overpaid for the stock. It stated:

> ... there shall not be included in any such calculation of net worth per share any of the life insurance proceeds received or receivable by the Corporation upon the death of a Stockholder. The Corporation shall pay over the full amount of such life insurance proceeds, to the extent received to the estate of the deceased Stockholder when the sale takes place as provided in Section 1.4. Such payments shall be applied against the purchase price for the shares. If the amount of life insurance proceeds received at any time as a result of the death of the Stockholder whose shares

are being purchased is greater then what the purchase price for such shares would be, based upon the value calculated as set forth above, then the amount of insurance proceeds so paid over shall be deemed to be the purchase price. If the insurance proceeds are less than the value so calculated then the purchase price shall be the value so calculated. *The proceeds of such life insurance shall be kept separate and apart from all other funds of the Corporation and shall be held by the Corporation, in trust, to be applied to its obligation to purchase the shares owned by the deceased Stockholder in accordance with the terms and provisions of this Agreement.* If all of the insurance proceeds have not been received when the sale takes place, then the Corporation shall assign to said estate the right to receive such proceeds. If the amount so assigned when received by the estate, is, together with all other amounts of purchase price received by the estate in excess of the total amount of purchase price to which the estate is entitled, then the estate promptly shall return to the Corporation the full amount received by the estate in excess of said purchase price.

Exh. 1, ¶ 1.8.3 (Emphasis added).

Eljay's purchase of shares of stock was subject to the restrictions imposed by law on New York corporations with respect to the purchase of their own shares of stock. If such restrictions would prevent either the purchase of any shares by Eljay or the payment of any installment of purchase price, then the parties agreed to vote for a reduction in the capital of Eljay in order to enable it to make any purchase or payment required under the Agreement. Exh. 1, ¶ 7. However, "if the amount of any insurance proceeds received by the Corporation in respect of the death of the Stockholder whose shares are being purchased exceeds the price which would be paid based upon such value, then the price shall be an amount equal to the amount of such insurance proceeds." Exh. 1, ¶ 1.8.1(ii).

Prior to the execution of the Agreement, Howard Bernstein, of the Joseph S. Herbert Company, Eljay's accountant, attend-

ed, as consultant to Korman and Blumenthal, a meeting of the Eljay shareholders convened to discuss the instrument. He testified that it was intended by Mallas that "all matters contained in the Agreement were to be effective on the date of signing," subject to further "embellishment," *i.e.*, purchase of additional insurance, so as to have sufficient proceeds to

> cover in the largest amount funds to pay out the decedent's estate on the buyback provision ... From time to time usually at year end the various stockholders [were to] meet with me, formally or informally, most of the times informally, to discuss whether the life insurance ought to be embellished to be greater than they were originally based on the new values of the company that might pertain on the audit date.

6/16/89 Tr., pp. 11–12.

To this Korman added that he understood that there was to be insurance on the lives of the three shareholders pursuant to the Agreement, that "the expressed purpose of this insurance was for the benefit of, God forbid, whoever passed away, that their family would retain the money," that "there was mention of a trust, but again it was [his] understanding that the trust was basically holding the money for the beneficiary if somebody was deceased," and that the Agreement was to be effective "[a]t the beginning of the shareholders' agreement, May of 1980." 6/16/89 Tr., p. 35.

On November 2, 1983, Connecticut Mutual Life Insurance Company ("Connecticut") issued life insurance policy No. 4271128 (the "Connecticut Policy") for the face amount of $400,000 on the life of Mallas, with Eljay named as owner and beneficiary. Compl., ¶ 7; Ans., ¶ 6.

A Standard Confirmation Inquiry dated May 25, 1984 and submitted to Phoenix by Bernstein on behalf of the corporation named Eljay as the owner and "Lou Mallas Inc., Corp. creditor as their interest may appear. Balance same as owner" as bene-

ficiaries of the Phoenix Policies. Exh. 41, 6/16/89 Tr., pp. 18–19. Note 2 of Eljay's certified financial statement dated April 28, 1984, Exh. 40, stated that the Debtor was the owner and beneficiary of the Phoenix Policies and the Connecticut Policies.[2] Bernstein averred that such information was confirmed by the insurer and inscribed on the policies. 6/16/89 Tr., pp. 10, 16. Although the audit note makes no mention of the Agreement, Bernstein claimed that the note was consistent with his assertion that the proceeds of the Policies would be paid to Eljay for turnover to a shareholder's estate under the Agreement. *Id.* He was, however, unable to explain why his company stated on the Standard Confirmation Inquiry that "Louis Mallas, Inc., corporate creditor" was the primary beneficiary and assignee of the Phoenix Policies, but did not do so in Eljay's financial statements. 6/16/89 Tr., pp. 17–20. A Standard Confirmation Inquiry, dated May 17, 1985, however, named Eljay alone as the beneficiary.

On July 14, 1986, Lou Mallas, Inc., by letter to Phoenix, acknowledged payment of all indebtedness due from Eljay and declared that it had no interest in the Phoenix Policies. Exh. 19. Phoenix, in a letter dated July 21, 1986 to Blumenthal, indicated that the Assignments in favor of Lou Mallas, Inc. were released. Exh. 21. On July 21, 1986, Eljay executed another Beneficiary Designation naming itself the beneficiary of the Phoenix Policies. Exh. 16.

Mallas passed away on August 21, 1986. After the issuance of preliminary letters testamentary to the Defendants, Defendant Ehrenkranz's attorney notified Phoenix on September 19, 1986 that a stock repurchase agreement required Eljay to pay over to the Mallas Estate the full amount of proceeds from the Phoenix Policies in exchange for the shares of Eljay held by the Mallas Estate. Exh. 23. He requested that no distribution be made until the legal

---

**2.** That financial statement also listed, as an Eljay asset, the aggregate cash surrender value of the policies Eljay owned on the lives of the shareholders, in an amount of $101,944, net of amounts due the insurers for loans granted by

them against such policies. Exh. 40, Note 2. The cash surrender value of the Policies was also scheduled as an asset of the Corporation in its tax return for the year ending May 3, 1986. Exh. 10.

rights of the parties were ascertained. *Id.* Phoenix informed Eljay that the Defendants would file an adverse claim to the proceeds. Exh. 24.

In November 1986, the Mallas Estate and Eljay compromised their differences by Eljay releasing its claim to the proceeds of the policies, Exh. 22 (the "Release"), and the Mallas Estate loaning Eljay $1,000,000 (the "Loan"), the payment of which was guaranteed by Korman. 6/16/89 Tr., p. 36.

In letters dated November 5, 1986, Korman advised Phoenix and Connecticut that Eljay released and assigned to the Mallas Estate its interest in the proceeds of the Policies. Exh. 2 and Exh. 3. He directed that payment of the proceeds of the Policies be made to the Mallas Estate. *Id.* Connecticut paid $409,210.58, the face amount of the Connecticut Policy plus accrued dividends, to the Mallas Estate on November 10, 1986. Exh. 5. Phoenix paid $2,293,659.74 to the Mallas Estate nine days later for the face amount of the Phoenix Policies plus accrued dividends. Exh. 4. On that date, the Mallas Estate loaned Eljay $1,000,000 pursuant to a Loan Agreement dated November 19, 1986. Exh. 8. Korman personally guaranteed the Loan. Exh. 9 and 6/16/89 Tr., p. 39. The Mallas Estate executed and delivered to Eljay a stock power on November 17, 1986, transferring to it Mallas' thirty-three Eljay shares. Exh. 43.

Eljay filed a petition for relief under Chapter 11 of the Bankruptcy Code two and one-half months later, on January 20, 1987 (the "Petition Date"). The Debtor scheduled liabilities in the amount of $18,-562,616 and assets in the amount of $1,957,891.90. Exh. 26. After the case was converted to Chapter 7 in January 1988, Plaintiff was appointed interim trustee, then qualified as trustee.

By this adversary proceeding, the Trustee seeks to recover the insurance proceeds transferred to the Mallas Estate. He contends that the payments of the insurance proceeds were avoidable under sections 544(b) and 550(a) of the Code because Eljay's repurchase of Mallas' shares, funded by the insurance proceeds, violated section 513 of the New York Business Corporation Law (the "BCL"). That statute prohibits redemption of shares by a corporation except from its surplus and prohibits purchase and redemption, and the continuing to fund purchase and redemption, when the corporation is insolvent or would thereby be made insolvent. *See Gold v. Lippman (In re Flying Mailmen Service, Inc.),* 539 F.2d 866 (2d Cir.1976). He also contends that the payments are avoidable under sections 548(a)(2)(A), 548(a)(2)(B)(i) and 550(a) of the Code as a fraudulent conveyance within one year of the bankruptcy petition, since at the time of the transfer in 1986, the Debtor was insolvent and the stock was worthless, rendering what the Debtor received for the transfer of the Proceeds less than "reasonably equivalent value." He further claims that the payments are avoidable under sections 547 and 550(a) of the Code as voidable preferences.[3] Compl., pp. 6–7.

In material part, Defendants asserted as affirmative defenses: (i) the Proceeds received by the Debtor were held "in trust" for the Mallas Estate such that the proceeds never became part of the Debtor's estate and there was no transfer of property of the Debtor's estate, and (ii) the Mallas Estate could offset the amount of the Loan and any pre-petition interest owed it by the Debtor against money deemed recoverable by the Trustee.

The Defendants moved for summary judgment, contending that there was no genuine issue as to whether the Agreement effectively established, as of May 3, 1980, a business insurance trust to fund the repurchase of the shares owned by Mallas at the time of his death. The Debtor was the trustee; the Mallas Estate was the beneficiary; the corpus was the right to receive the proceeds of the Phoenix Policies; and Eljay's retention of the Phoenix Policies in 1980 and of the Connecticut Policy in 1983

---

**3.** It does not appear that the Mallas Estate was a creditor of Eljay when it received the proceeds. Since the payment was not on account of an antecedent debt, no preference action under § 547(a) of the Bankruptcy Code may be sustained.

constituted the requisite delivery. It was argued that, to the extent the court found that a valid trust was not created, there was a genuine issue as to Eljay's insolvency at the time of the Transfers. Defs' Sum.J.Mem., pp. 2, 4–6; Defs' Rep.Sum.J. Mem. pp. 5–9.

In response, the Trustee cross-moved for summary judgment, claiming that there was no genuine issue to be tried, the record undisputedly reflecting that the Debtor was insolvent at the time the insurance proceeds were transferred to the Mallas Estate, no trust was created, the proceeds were property of the Debtor's estate, and the proceeds were transferred to the Mallas Estate in November of 1986. Pl's Sum. J.Mem. pp. 8–13; Pl's Rep.Sum.J.Mem. pp. 1–4.

This court denied both motions for summary judgment based on the record and ruled that the following issues were to be tried: (i) whether and when a valid trust was intended to be and was in fact established, and (ii) whether Eljay was insolvent in November 1986 when the proceeds were paid to the Mallas Estate.

At the trial, the testimony convincingly showed that Eljay was insolvent at the time of the transfers since its liabilities exceeded its assets by at least $30,000 (and possibly by several million dollars more if guarantees of its affiliates were included) in both May 1986 and January 1987, and there was no evidence of an upturn in the interim. The Court, therefore, made that finding and reserved on the trust issue. 6/16/89 Tr., pp. 49–51.

In asserting that a valid trust was created by the Agreement in 1980, and, therefore, that Eljay had no interest of its own in the proceeds of the Phoenix Policies in 1986 when it was insolvent, Defendants claim that the corpus of the trust at the time of its creation in 1980 was the right to receive those proceeds. Defs' Cor.Pre–Tr. Mem., p. 11. The right to receive the proceeds of the Connecticut Policy was added to the corpus in 1983. *Id.* No physical delivery of the policies or any other document was required to establish a trust. Defs' Cor.Pre–Tr.Mem., pp. 14–16. The trust was intended to be immediately effective, *i.e.,* in 1980, and it was not fatal to the creation of an insurance trust that the Agreement referred to "proceeds" only. Defs' Cor.Pre–Tr.Mem., pp. 11–13, 23–24.

In response, the Trustee argues, *inter alia,* that the Agreement did not evince an intent to impress a trust on the policies. Since the proceeds of any policies on the life of an officer had to be assigned to a deceased shareholder's estate if not received at the time of the sale of such shareholder's stock to Eljay, there was no delivery of the *res* and a trust was created only to the extent the Debtor received the funds, *i.e.,* a trust *in futuro.* Pl's Sum.J. Mem., pp. 9–10. Nor could the Defendants claim that the Debtor's retention of the policies constituted the requisite delivery because the Agreement spoke to *proceeds* only. *Id.* Had the parties intended that policies be the corpus, they should have so provided, or named Eljay the beneficiary of an identical policy "in trust". *Id.* The Trustee also asserts that permitting the Phoenix Policies to be used as collateral was inconsistent with creation of a trust.

II

The first principal issue is whether Eljay, in protecting its insurable interest in Mallas' earning capacity by procuring what is commonly known as "key-man insurance," *Secor v. Pioneer Foundry Co.,* 20 Mich. App. 30, 35, 173 N.W.2d 780, 783 (1969); Black's Law Dictionary 723, 781 (5th Ed. 1979), did in fact establish a valid business life insurance trust in 1980 to assure repurchase of Mallas' shares upon his death.

If no trust of the rights under the Phoenix Policies and subsequently obtained Connecticut Policy were created in 1980, it is given that the insurance proceeds were solely property of the Debtor. In that case, it is not disputed by Defendants that the transfer of those proceeds occurred in 1986 when Eljay was insolvent, or by virtue of the transfer became insolvent. June 13, 1989 Transcript, pp. 7–8. It would follow that the Proceeds were transferred to the Mallas Estate in 1986 to fund the repurchase of the shares of Eljay (i) in violation

of BCL § 513 and, as such, the transfer of that property is avoidable under § 544(b) of the Code because a creditor holding an allowable unsecured claim may avoid such a transfer[4] or (ii) for which Eljay did not receive reasonably equivalent value under § 548(a)(2) of the Bankruptcy Code and, in either instance, may be recovered from the Mallas Estate under § 550(a)(1) of the Bankruptcy Code. On the issue of creation of a valid trust the Defendants concede that they shoulder the burden of proof. Defs' Post–Tr.Mem., pp. 22–23.

### A

■ An express trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." *Coleman v. Golkin, Bomback & Co., Inc.,* 562 F.2d 166, 168–69 (2d Cir.1977), quoting Restatement (Second) of Trusts § 2 (1959). Generally, four elements comprise an express *inter vivos* trust: (1) a designated beneficiary; (2) a designated trustee who is not the sole beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) the actual delivery of the fund or other property, or the legal assignment thereof to the trustee, with the intention of passing legal title thereto to him as trustee. *E.g. Brown v. Spohr,* 180 N.Y. 201, 73 N.E. 14 (1904).

A trust whose corpus is comprised of life insurance policies bears advantages in that the trustee may take immediate action with the proceeds on the death of the insured, E. Phillips, *Life Insurance Trusts: A Reca-*

*pitulation for the Draftsman,* 81 U.Pa.L. Rev. 284, 286 (1933), and the beneficiaries may enjoy estate tax savings under both federal and state laws, New York State Legislative Annual 1960, A.I. 1239, Pr. 3543, Ingalls ch. 1066, 28–29.

### B

#### i

Life insurance trusts are the subject of statute in New York. Section 13–3.3(a)(1) of the New York Estates Powers and Trusts Law ("EPTL") provides, in relevant part:

(a) The proceeds of ... life ... insurance policies may be made payable to a trustee designated as beneficiary in the manner prescribed by this section and named as:

(1) Trustee under a trust agreement or declaration of trust *in existence at the date of such designation, and identified in such designation,* and such proceeds shall be paid to such trustee and be held and disposed of in accordance with the terms of such trust agreement or declaration of trust, including any amendments thereto, as they appear in writing on the date of the death of the insured ... *It shall not be necessary to the validity of any such trust agreement or declaration of trust that it have a corpus other than the right of the trustee as beneficiary to receive such proceeds* ...

(2) Trustee of a trust to be established by will, and ... such proceeds shall be payable to the trustee to be held and disposed of in accordance with the terms of such will as a testamentary trust ...

---

**4.** *Vowteras v. Argo Compressor Service Corp.,* 77 A.D.2d 945, 431 N.Y.S.2d 136 (2d Dept.1980), later app'd, 81 A.D.2d 582, 437 N.Y.S.2d 689 (1981), *later app'd,* 83 A.D.2d 834, 441 N.Y.S.2d 562 (1981), *app denied,* 55 N.Y.2d 605, 447 N.Y. S.2d 1028, 432 N.E.2d 603 (1982) (BCL § 513 ensures that the assets left after a distribution to shareholders are sufficient to cover existing liabilities and stated capital); *Nakano v. Nakano Adv.,* 84 Misc.2d 905, 377 N.Y.S.2d 996, *reh'g granted in part,* 84 Misc.2d 905, 377 N.Y.S.2d 1001 (Sup.Ct.N.Y.Co.1975) (BCL § 513 was designed to protect creditors who extend credit in

reliance upon a corporation's capital structure). *See also Flying Mailmen,* 539 F.2d 866; *In re Dino & Artie's Automatic Transmission Co., Inc.,* 68 B.R. 264 (Bankr.S.D.N.Y.1986) (BCL § 513 reinforces the basic rule that the equities generally favor the conventional general creditors rather than stockholders or former stockholders).

Section 544(b) gives a bankruptcy trustee the power to avoid transfers that are avoidable by creditors under other applicable law such as state law.

(f) This section shall be construed as declaring the law as it existed prior to its enactment and not as modifying it.

EPTL § 13–3.3, added c. 1976, c. 626, § 1 (Emphasis added).

■ By providing that a trustee may be named as beneficiary of a life insurance policy pursuant to a trust instrument or a will, and that the contractual right to receive proceeds of an insurance policy is a legally cognizable corpus, EPTL § 13–3.3 dispels any doubt that in New York the right to receive proceeds of a life insurance policy may be the corpus of a valid *inter vivos* trust.

EPTL § 13–3.3 has propagated one reported case. In *In re Stein*, 131 A.D.2d 68, 520 N.Y.S.2d 157 (2d Dept.1987), *appeal dismissed without opinion*, 72 N.Y.2d 840, 530 N.Y.S.2d 555, 526 N.E.2d 46 (1988), the insured purchased a life insurance policy and designated "James Hume as Trustee" the beneficiary of the policy nearly a year later. Some twenty days after the designation, the insured executed a trust instrument appointing Hume as trustee of the proceeds of the policy and directing him to disburse the proceeds in a specified manner. The court held that compliance with EPTL § 13–3.3(a)(1) is mandatory and that a valid trust was not created because the *inter vivos* trust instrument was not in existence at the time the trustee was designated as beneficiary, as required by the clear and express language of the statute.

In so ruling, the *Stein* court rejected a lower court's interpretation that the state legislature, by amending the statute in 1976, did not intend to impose a requirement that a trust instrument ante-date the designation of the trustee as the beneficiary of a policy. Prior to that amendment in 1976, the statute contained no express requirement that the trust pre-date the designation. It merely required that the trust agreement be "made by the insured during his life time." EPTL § 13–3.3, L.1966, c. 952. eff. 9/1/67. The court reasoned that the lower court's interpretation of the current version of EPTL § 13–3.3 would render the language "in existence at the date of such designation" a nullity; that a stat-

ute would not be held a mere re-enactment of a prior statute if any other reasonable interpretation is attainable; and that EPTL § 13–3.3(f) cannot mean that prior law supersedes the amendment and therefore does not require a contrary result.

With these conclusions we agree. The change in language is too dramatic to be ignored. Furthermore, it does not appear that the issue was settled prior to enactment of the current version of EPTL § 13–3.3 in 1976, or prior to 1960 when section 47–f of the Decedent's Estate Law ("DEL"), the predecessor to the original version of EPTL § 13–3.3, was enacted. Rather, EPTL § 13–3.3 and the *Stein* court's holding that the trust agreement must be in existence at the time the trustee is designated as beneficiary clarifies prior law which required only that the trust agreement must be made during the insured's lifetime. The New York Court of Appeals, in two cases ante-dating the enactment of DEL § 47–f, found, also without focussing upon the timing issue, valid life insurance trusts where the trust agreement occurred prior to the beneficiary designation. *See, Blanco v. Velez*, 295 N.Y. 224, 66 N.E.2d 171 (1946); *Hirsh v. Auer*, 146 N.Y. 13, 17, 40 N.E. 397, 398 (1895).

Lower courts found valid trusts regardless of whether the trust was established prior to or after the designation, also without focusing on the timing issue. In *In re Kent's Trust*, 28 Misc.2d 196, 197, 212 N.Y. S.2d 657, 659 (Sup.Ct.N.Y.Co.1961), *In re Kyte's Will*, 174 Misc. 1094, 1095, 22 N.Y. S.2d 236, 237 (Sur.Ct.Erie Co.1940) and *Johnston v. Scott*, 76 Misc. 641, 643, 137 N.Y.S. 243, 245 (Sup.Ct. Saratoga Co.1912), trusts were established prior to the trustee being named beneficiary. In *Palmer v. MacDougall*, 14 A.D.2d 580, 580, 218 N.Y. S.2d 385, 386 (2d Dept.1961); *In re Mackintosh's Estate*, 140 Misc. 12, 14, 249 N.Y.S. 534, 535 (Sur.Ct.Westchester Co. 1931) and *Lauterbach v. New York Inv. Co.*, 62 Misc. 561, 563–64, 117 N.Y.S. 152, 153–54 (Sup.Ct.N.Y.Co.1909), *aff'd sub nom People ex rel La Chicotte v. Stevenson*, 137 A.D. 940, 122 N.Y.S. 1141 (1st Dept.1910), however, the insured designat-

ed the beneficiary of the insurance policy prior to creation of the trust. None of these courts addressed the issue and EPTL § 13–3.3 can be viewed as merely clarifying and resolving an open issue.

### ii

These considerations bring us to the issue of whether EPTL 13–3.3 applies to life insurance trusts established by an owner/beneficiary who is *not* the individual whose life is the subject of the policy. If the statute applies, then clearly the 1977 designation with respect to the Phoenix policies would not comply with it. The designation preceded the creation of the alleged trust in 1980 and does not refer to Eljay as trustee. Defendants do not claim that the 1986 designation had any force and effect. Eljay was then insolvent. Defendants do not dispute that the 1986 designation would be a transfer of estate property for which the only consideration would be shares of an insolvent company and such a transfer would violate § 513 of the BCL[5] and § 548 of the Bankruptcy Code.

In determining the scope of EPTL § 13–3.3, we look first to the language of the statute. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668, *reh'g denied,* 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). At first blush, the words of sub-section (a) appear to be all-embracive. No facial distinction is made on the basis of the identity of the trust settlor.

However, "in construing a statute, the task of the courts is to interpret the words of the statute in light of the purposes that animated the law makers in enacting it." *Korea Shipping Corporation v. New York Shipping Association,* 880 F.2d 1531, 1537 (2d Cir.1989). Here the words of the statute appear in a context that gives pause. Sub–Section (a)(2) refers to testamentary trusts. Sub-section (b) provides for payment of insurance proceeds to the insured's beneficiaries in the absence of a valid designation. Together, these sub-sections

strongly imply that the New York legislature intended EPTL § 13–3.3 to apply only to instances where an individual owning life insurance on his on life intended to create a life insurance trust funded by the proceeds of that insurance.

Sub-section (f) confirms the limited scope of EPTL § 13–3.3. As noted, the statute in its present form was an amendment of former EPTL § 13–3.3 which had, in 1966, re-enacted former DEL § 47–f verbatim. Former EPTL § 13–3.3 had embraced trusts established by an insured "during his life time". That phrase limited EPTL § 13–3.3 to the trusts established by individual settlors of policies on their own lives. Sub-section (f) states no change was intended. Although we agree with the *Stein* court that the legislature should not be deemed as having intended to use words without meaning, following the direct command of a statute, as in *Stein,* is a far different thing from interpreting a statute consistent with its former version if other portions of the current statute indicate that no change was intended.

██ Such a limitation here is, moreover, consistent with and supported by the sparse legislative history concerning EPTL § 13–3.3. That history shows that EPTL § 13–3.3 was designed to liberalize life insurance trusts in order to enable greater flexibility in estate planning by making sure they were not testamentary in nature and were consistent with the rules applicable to federal estate taxation. Memorandum by a Staff Attorney of the Law Revision Commission relating to Assembly Bill No. 11442; Memorandum for the Governor by Louis J. Lefkowitz, Attorney General, June 18, 1976. The organized bar so understood the section. Report of the Association of the Bar of the City of New York, Committee on Trusts, Estates and Surrogate's Courts No. 140, p. 395, June 26, 1976. This purpose is inconsistent with applying the statute to instances where the owner is not the person whose life is insured, such as "key-man" insurance taken

---

**5.** Requested by the Court to file a supplemental brief on these issues to which Plaintiff would respond, Defendants claimed that EPTL

§ 13–3.3 did not apply rather than assert that the 1986 designation was not voidable.

out by companies on the lives of essential corporate officers. A corporation is not concerned with estate planning and federal estate taxation. For these reasons, we hold that EPTL § 13–3.3 does not apply here.

### C

Consequently, we turn to the well-settled rules regarding the creation of life insurance trusts.

First, to establish a present *inter vivos* trust, an insurance policy must be in existence at the time a trust is declared or an agreement executed. *Blanco*, 269 A.D. 133, 54 N.Y.S.2d 217; *Hirsh*, 146 N.Y. 13, 40 N.E. 397; *Palmer*, 14 A.D.2d 580, 218 N.Y.S.2d 385; *Kent*, 28 Misc.2d 196, 212 N.Y.S.2d 657; *Kyte*, 174 Misc. 1094, 22 N.Y.S.2d 236; *Mackintosh*, 140 Misc. 12, 249 N.Y.S. 534; *Johnston*, 76 Misc. 641, 137 N.Y.S. 243; *Lauterbach*, 62 Misc. 561, 117 N.Y.S. 152.

■ Second, such trusts are effective during the lifetime of the insured, either upon delivery of the *res*, upon assignment to the trustee enabling legal title to the fund to pass, or in cases where the settlor is also the trustee, upon the declaration of trust. In this, the corpus of the *inter vivos* life insurance trust is the "contingent interest of the insured [or owner] in the certificate of insurance ... [which] became vested at the death of the insured, and the beneficiary, having collected the insurance money, the trust under the agreement creating and acknowledging it, attached to the fund." *Hirsh*, 146 N.Y. at 19, 40 N.E. at 398. Title to the policies passes to the trustee upon satisfaction of the steps necessary to create a trust. *Lauterbach*, 62 Misc. 561, 117 N.Y.S. 152. *See also Blanco*, 295 N.Y. 224, 66 N.E.2d 171; *Palmer*, 14 A.D.2d 580, 218 N.Y.S.2d 385; *Bellinger v. Bellinger*, 180 Misc. 948, 46 N.Y.S.2d 263 (Sup.Ct.N.Y.Co.1943); *Mackintosh*, 140 Misc. 12, 249 N.Y.S. 534; Restatement (Second) of Trusts § 82, Comment b (1959) ("the interest of a person named as beneficiary of a life insurance policy may be held in trust").

Even where a trust instrument explicitly provides that the trust is to be "operative only with respect to the proceeds of the policy paid to the trustee upon the death of the insured after deduction of all charges against the policy," it has been held that the trust was not testamentary in nature, but took effect upon delivery of the policy during the life of the insured; the rights under the policy then accrued and were merely postponed until after the insured's death. *In re Kent's Trust*, 28 Misc.2d 196, 212 N.Y.S.2d 657. Although the court in *Broga v. Rome Trust Co.*, 151 Misc. 641, 272 N.Y.S. 101 (Sup.Ct. Oneida Co.1934) ruled that such language is testamentary in nature, EPTL § 13–3.3, although not directly applicable to insurance trusts established by corporations, confirms that, in New York, a trust of insurance proceeds is an *inter vivos* trust of the policy. It is reasoned that:

> [a] trust may be created although there is no mention of a trust in the policy. Where the policy is payable to a beneficiary, a trust may arise from an agreement between the beneficiary and the insured that the beneficiary will collect the proceeds of the policy on the death of the insured and hold them for or pay them over to a third person. The beneficiary of the policy thereupon holds his interest in the policy in trust for the third person and when he receives the proceeds after the death of the insured he holds them in trust.

A.W. Scott & W.F. Fratcher, The Law of Trusts § 57.3, at 155 (4th ed. 1987) (hereinafter "Scott").

Third, "the property and the disposition of it [must be] definitely stated," *Hamer v. Sidway*, 124 N.Y. 538, 550, 27 N.E. 256, 258 (1891) or the corpus must be "sufficiently designated or identified to enable title thereto to pass to the trustee." *Brown*, 180 N.Y. at 209, 73 N.E. at 17. *See also*, Restatement (Second) of Trusts § 76 (1959) ("a trust cannot be created unless the subject matter is definite or definitely ascertainable"); Scott § 76, at 440 ("a trust cannot be created where the subject matter is not definite or definitely ascertainable from the facts existing at the

time of the creation of the purported trust").

A declaration stating "[l]ife policy # 80547, $1,000, with profits on my life" is obviously sufficient. *Mackintosh*, 140 Misc. at 13, 249 N.Y.S. at 535. But less specificity is acceptable. Where the policies and the trust instrument were contemporaneously delivered to the trustee, the description "two policies amounting to $75,000 made out to your order as trustee" was found sufficient. *Lauterbach*, 62 Misc. at 563, 117 N.Y.S. at 153. Two declarations of trust, one "affecting" a policy in the amount of $62,500 and the other "affecting" a $32,580 policy were up held in *Johnston*, 76 Misc. at 643, 137 N.Y.S. at 245. From such descriptions, the courts could determine the trust *res* with a fair degree of definiteness. *Cf.* 61 N.Y.Jur.2d *Trusts* §§ 56, 58 (1968).

Conversely, where the settlor intended to limit the corpus of the trust to $50,000 in cash and proceeds of tax-exempt bonds and the settlor owned a number of bonds greater than the number intended to fund the trust, general descriptions in a purported trust instrument such as "tax exempt bonds" and "U.S. bonds furnished" are inadequate. *Sussman v. Sussman*, 61 A.D.2d 838, 402 N.Y.S.2d 421 (2d Dept. 1978), *aff'd* 47 N.Y.2d 849, 418 N.Y.S.2d 768, 392 N.E.2d 881 (1979). The court stated that absent delivery of the bonds intended to the trustee, specific identification was required. *Id.*, 61 A.D.2d at 839, 402 N.Y.S.2d at 423. Lacking such description, the court could not tell which of the bonds were subject to the trust.

■ Fourth, where the owner of property declares himself trustee of it for another, the trust is valid although the settlor does not part with the trust instrument. Scott § 32.5, at 369.

[Where] there is a written trust declaration ... delivery is not necessary to constitute a valid trust. The owner has declared that he, himself, holds the property in trust for the person designated. A writing creating a trust, kept by the donor without delivery to anyone, will be given effect as such by the courts.

*MacKintosh*, 140 Misc. at 14, 249 N.Y.S. at 536.

For the same reasons, there is no need for "delivery," *i.e.*, physical delivery of the *res* or other property or a legal assignment of the fund to the trustee where the settlor and the trustee are the same entity. *Coleman*, 562 F.2d at 169 n. 5 (applying New York law); Scott § 32.5 at 369; Restatement (Second) of Trusts § 17 Comment a (1959).

■ Fifth, the cases firmly establish that a reservation of the right by the settlor under a policy of insurance to use the policy as security for a loan or for any other purpose will not defeat an otherwise valid life insurance trust: it is held that retention of a right to pledge the policy as collateral is not inconsistent with disposition of the equity interest in the policy, whatever it may be. *See Hirsh*, 146 N.Y. at 19, 40 N.E. at 398; *Males v. New York Life Ins. Co.*, 48 A.D.2d 50, 367 N.Y.S.2d 575 (3rd Dept.1975); *Kent*, 28 Misc.2d 196, 212 N.Y.S.2d 657; *Johnston*, 76 Misc. 641, 137 N.Y.S. 243; *Lauterbach*, 62 Misc. at 566, 117 N.Y.S. at 155.

■ Sixth, there must be either an explicit declaration of trust or circumstances showing unequivocally, and admitting of no other intention, than that a trust was intended to be created. *Wadd v. Hazelton*, 137 N.Y. 215, 33 N.E. 143 (1893); *Martin v. Funk*, 75 N.Y. 134 (1878); *Shea v. Crofut*, 203 A.D. 210, 214, 196 N.Y.S. 850, 853 (2d Dept.1922); *In re Skuse's Estate*, 165 Misc. 554, 1 N.Y.S.2d 202 (Sur.Ct.Kings Co.1937) (where reliance is placed on acts alone, those acts must be so clear as not to be capable of any other construction or consistent with another intention). *C.f. Del Drago v. Commissioner of Internal Revenue*, 214 F.2d 478 (2d Cir.1954); *Elyachar v. Gerel Corporation*, 583 F.Supp. 907 (S.D.N.Y.1984). *See also Sayer v. Wynkoop*, 248 N.Y. 54, 59, 161 N.E. 417, 418, *reh'g denied*, 248 N.Y. 591, 162 N.E. 537 (1928); *Title Guarantee & Trust Co. v. Haven*, 214 N.Y. 468, 481, 108 N.E. 819, 823 (1915); *Beaver v. Beaver*, 117 N.Y. 421, 428, 22 N.E. 940, 941 (1889); *In re Estate*

of *Fontanella,* 33 A.D.2d 29, 30–31, 304 N.Y.S.2d 829, 831 (3d Dept.1969); *Wojtkowiak v. Wojtkowiak,* 85 N.Y.S.2d 198, 202 (Sup.Ct. Erie Co.1947), *aff'd,* 273 A.D. 1052, 81 N.Y.S.2d 171 (4th Dept.1948); *In re Schrieb's Will,* 190 Misc. 547, 78 N.Y.S.2d 54 (Sur.Ct.Richmond Co.1947); *Sadwith v. Lantry,* 219 F.Supp. 171, 176 (S.D. N.Y.1963) (holding that the test is the beyond a reasonable doubt standard).

No particular, legal or technical words, including "trust", need be employed to create an express trust. *Title Guarantee,* 214 N.Y. at 481, 108 N.E. at 822; *Sayer,* 248 N.Y. at 59, 161 N.E. at 418. Use of the word "trust" is not determinative in bankruptcy or under New York law. *In re Lord's Inc.,* 356 F.2d 456 (7th Cir.1965) *cert. denied sub nom, Chicago Cutter–Karcher, Inc. v. Maley,* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966); *In re Shulman Transportation Enterprises, Inc.,* 21 B.R. 548, 552 (Bankr.S.D.N.Y.1982), *aff'd,* 33 B.R. 383 (S.D.N.Y.1983), *aff'd,* 744 F.2d 293, 12 B.C.D. 779, Bankr.L.Rptr ¶ 70,138 (CCH) (2d Cir.1984); *In re Paley,* 8 B.R. 466, 469, 3 C.B.C.2d 648, Bankr.L.Rptr. (CCH) ¶ 67789 (Bankr.E.D.N.Y.1981) (for purposes of dischargeability of an individual acting in a fiduciary capacity under § 727 of the Code). Rather, intention is to be found in "direct and positive acts which indicate an intention to create a trust." *Two Clinton Square Corp. v. Friedler,* 91 A.D.2d 1193, 459 N.Y.S.2d 179 (4th Dept. 1983); *see also Palmer,* 14 A.D.2d at 580, 218 N.Y.S.2d at 387. In addition, "[a]ll the transactions, the insurance papers, the assignments thereof and the trust deeds, are to be considered together, each being a part of the complete transaction." *Johnston,* 76 Misc. at 645–46.

### III·

As applied to this case, it is clear that the Trustee's assertions that the trust is invalid through lack of delivery of the policies or the trust instrument, the assignment of the Phoenix proceeds to Lou Mallas Inc. as collateral, and the lack of a *res* until the insurance proceeds are delivered to the putative trustee, are without merit. The cases squarely hold that a beneficiary seeking to declare itself trustee need not make a formal delivery of the trust *res* or trust instrument to itself as trustee. *Mackintosh,* 140 Misc. at 14, 249 N.Y.S. at 536; *Coleman,* 562 F.2d at 169 n. 5; Scott § 32.5 at 369. They further establish, under New York law, that assignment of insurance policies as collateral does not defeat an otherwise valid insurance trust. *Hirsh,* 146 N.Y. 13, 40 N.E. 397; *Males,* 48 A.D.2d 50, 367 N.Y.S.2d 575; *Kent,* 28 Misc.2d 196, 212 N.Y.S.2d 657; *Johnston,* 76 Misc. 641, 137 N.Y.S. 243; *Lauterbach,* 62 Misc. at 566, 117 N.Y.S. 152. It is also clear that, if properly established, an insurance trust has the policy itself as its *res* and the proceeds are to be distributed on the death of the insured pursuant to the trust. Scott § 57.3, at 155.

### A

The evidence here, moreover, shows that in entering into the shareholders agreement, Eljay and its shareholders intended to create some kind of a trust. While the mere declaration of a trust may not be sufficient indicia of intent, *Shulman,* 21 B.R. at 552, here there is more. The elaborate provisions of the Agreement and the testimonial evidence establish unequivocally and beyond a reasonable doubt, that the parties intended to create a trust.

Confirming that the Agreement constituted an express declaration of trust are the unrebutted testimony of intention and the Agreement's provision for repurchase of stock for the higher of the book value as determined periodically or the insurance proceeds received by Eljay as trustee on the death of the stockholder. The classic elements of a business life insurance trust evincing intent to provide a fair price for the buyback of a principal's interest, by way of periodic valuation or maintaining insurance, J. Hanna, *Some Legal Aspects of Life Insurance Trusts,* 78 U.Pa.L.Rev. 346, 349 (1930), are thus present.

The 1984 and 1985 Standard Confirmation Inquiries, Exh. 41, relied on by the trustee do not show a lack of intent in 1980. The 1984 Standard Confirmation In-

quiry properly indicated that the assignee for purposes of collateral, Lou Mallas Inc., was the primary beneficiary and that Eljay was the secondary beneficiary. The 1985 Standard Confirmation Inquiry correctly or incorrectly failed to refer to Lou Mallas, Inc. Both failed to indicate that Eljay, as sole beneficiary of the Phoenix Policies, held that interest as trustee. No claim is made that Eljay, as beneficiary of a trust, was required to report to Phoenix that it held only legal title to the proceeds since EPTL § 13–3.3 is inapplicable.

The listing of the cash surrender value of the Policies in Eljay's financial statements and tax returns is also not inconsistent with the Defendants' trust theory and Eljay's disclaimer of an equitable interest in the Proceeds. Although a more accurate reporting consistent with the trust theory would have revealed that Eljay had only a legal and not beneficial interest in the Proceeds, such reporting is apparently sanctioned by Generally Accepted Accounting Principles, 6/16/89 Tr., pp. 27–29.[6] Eljay, as owner of the Policies, was entitled to recoup payments of premiums in excess of actual actuarial costs in the event it desired to terminate the policies before the death of the insured. S. Riesenfeld, *Creditors' Remedies and Debtors' Protections*, p. 311 n. 10 (4th ed. 1987).

Nor does Eljay's having disputed the interest of the Mallas Estate in 1986 bear on the intention of the parties to create a trust in 1980. Eljay was insolvent in 1986. Its claiming of the proceeds and its eventual settlement of that dispute by receiving a $1,000,000 loan was a grasping at straws for survival.[7]

Thus, we are left on this score with the Agreement of the parties and the testimony of their intention at that time. That evidence unequivocally shows an intention to create a trust.

We, therefore, turn to the issues of whether the trust *res* was identified with the specification required by New York law and whether the alleged trust in issue here was, in fact, a present *inter vivos* trust or a trust that was designed to come into being *in futuro* when the proceeds were received.

### B

█ The Trustee's contentions that a trust was not created because the Agreement failed to identify specifically the then existing Phoenix Policies or to mandate procurement of any policies is not without some merit. The Agreement merely provides that any life insurance proceeds received or receivable by the Corporation would be held in trust. Without doubt, a reference in the Agreement to Phoenix, the number or face amounts of the Phoenix Policies, or even to "existing policies" or "after acquired policies" would have made the provision more clear. Our task, however, is to determine not whether the language is perfect but whether it is clear enough to permit identification of the trust *res*.

Here, the description indicates that the *res* is the right to receive proceeds from *all* policies of which Eljay was the designated beneficiary, in existence at the time the Agreement was executed or procured thereafter. As such the *res* was definitely ascertainable.

Unlike the circumstances in *Sussman*, there is no indication in the description or elsewhere in the record that a trust was intended to be impressed upon only some policies procured by Eljay. Bernstein's testimony that other policies might be added to the trust supports this construction. His further testimony that it was intended that proceeds of insurance be sufficient to fund the buyback and the provision in the Agreement that the purchase price was to be the higher of the calculated value or proceeds of policies are consistent with the

---

**6.** While a creditor who extended credit in reliance on the auditor's incomplete statement of Eljay's interest in the policies might be aggrieved, no such creditor has been identified by the Trustee.

**7.** Because of the settlement, payment of the proceeds of the Phoenix Policies directly to the Mallas Estate, as opposed to Eljay as trustee, also does not necessarily give rise to an inference that a trust was intended.

intent to form a trust of all life insurance policies. By permitting the trust to include additional life insurance policies as the value of Eljay stock increased, Eljay was to be relieved, in whole or in part, from the prospective burden of dipping into its own coffers to repurchase a deceased shareholder's stock.[8]

The Trustee's assertion that in 1977 Eljay intended for the Phoenix Policies to collateralize the debt owed to Louis Mallas Inc. and to retain a beneficial interest in the difference between the proceeds and balance of the Loan is of no moment. When the parties executed the Agreement in 1980, Eljay had a different intent: to hold the proceeds of all life insurance policies on Mallas' life in trust for the estate of Mallas to the extent of its residual interest. It manifested that intent, albeit not in the clearest manner, in the Agreement. That Eljay was entitled to do.

## C

These considerations leave us with the issue of whether a present trust was intended.[9] That the Agreement provided that Eljay would collect and distribute *proceeds* of any life insurance policies and did not speak specifically to *policies* does not preclude the finding of a present trust and seems to confirm that intention. The Agreement was formulated on the advice of counsel. Presumably counsel was aware that the courts have held such language to create a present trust of an insurance policy. *Blanco*, 295 N.Y. 224, 66 N.E.2d 171; *Hirsh*, 146 N.Y. at 19, 40 N.E. 397; *Palmer*, 14 A.D.2d 580, 218 N.Y.S.2d 385; *Bellinger*, 180 Misc. 948; *Mackintosh*, 140 Misc. 12, 249 N.Y.S. 534; *Lauterbach*, 62 Misc. 561, 117 N.Y.S. 152; Scott § 57.3, at 155.

Bernstein's and Korman's testimony that the Agreement and all matters in the Agreement were to be effective in May 1980 is more persuasive. They made no distinction as to the operative date of the trust provisions. It is credible that to laypersons such as Bernstein and Korman, the immediate effectiveness of the Agreement, in their minds, meant effectiveness of the trust.

The provisions requiring Eljay to *assign* and a stockholder's estate to *return* insurance proceeds, however, gives considerable pause. If it did not own the proceeds itself but only as trustee, there was no need for Eljay to assign that which it did not own. Similarly, the use of the word "return" gives the connotation that the proceeds were owned by Eljay.

Nevertheless, it also appears that at least the "return" requirement is consistent with the establishment of a trust. The clauses in question state:

> If all of the insurance proceeds have not been received when the sale takes place, then the *Corporation shall assign* to said estate the right to receive such proceeds. If the amount so assigned when received by the estate, is, together with all other amounts of purchase price received by the estate in excess of the total amount of purchase price to which the estate is entitled, then the *estate promptly shall return to the Corporation* the full amount received by the estate in excess of said purchase price.

Exh. 1, ¶ 1.8.3. (Emphasis added). This language attempts to address the situation where Eljay, after paying the calculated purchase price for the stock of a deceased shareholder including a credit for insurance proceeds, overpaid. Since the sale was to occur within a specified time under the

---

8. In its fiscal year ending April 28, 1984 during which it purchased the Connecticut Policy, Eljay had an increase in surplus of $480,000. *See* Exh. 40 at 3.

9. Whereas a manifestation of an intention to create a present trust gives rise to an immediately effective trust, manifestation of an intention to create a trust at a subsequent time will not give rise to a present trust and a trust will later arise under limited circumstances, *e.g.*, where a

person executes a declaration of trust of certain property not at the time owned by him and he thereafter purchases property of that description, the act of acquiring the property coupled with the earlier declaration of trust may be a sufficient manifestation of an intention to create a trust at the time of the acquisition of the property. Restatement (Second) of Trusts § 26, Comment k, Illus. 12 (1959).

Agreement, Eljay might have been required to pay a portion of the purchase price to a deceased stockholder's estate prior to the payment of proceeds by the insurance company. The provision ensures that Eljay would be reimbursed for its outlay.

This reasoning, however, does not account for the use of an assignment concept. Under trust theory, Eljay need only comply with the trust, not separately assign its bare legal title as trustee. No explanation of that language was proffered by any witness.

All this record contains is Bernstein's testimony that Mallas intended and Korman's testimony that he intended that any policies procured by Eljay be for the benefit of a deceased stockholder's estate and that a trust was to be effective in 1980. The assignment language, as indicated above, is inconsistent. That language, however, could also be construed to refer to an intention that Eljay inform the issuers of the policies of the beneficial interest of the deceased shareholder.

Thus, this is a case where the evidence unequivocally shows that the parties intended to create a trust but where not all of the evidence bearing on this issue indicates an intention to create a present trust. The evidence is not unequivocal because the assignment language of the Agreement indicates, contrary to Bernstein's and Korman's testimony, that the trust was to arise on receipt of the proceeds. Such a construction is, moreover, consistent with the natural meaning of the phrase that the "proceeds are to be held in trust," employed in the Agreement, notwithstanding the meaning given to that phrase under New York law.

Although the rule is clear that intention to form a trust must be unequivocal, no cases have been cited to us and we have not been able to find any case regarding the burden of proof required to establish a present trust as opposed to a trust *in futuro*. The question is of significance here given Eljay's insolvency when Mallas died and the use of the proceeds to fund its obligation to purchase its shares in 1986. If the trust arose in 1986, the transfer of the proceeds in 1986 to the trust or to defendants is voidable as discussed above.

■■■ Precisely put, the issue is whether the New York courts would distinguish the burden of proof necessary to show intention to form a trust from the burden of proof showing the nature of the trust intended. We think that they would make such a distinction. The policy justification for requiring an exceptionally high standard of proof of intention to form a trust lies in the putative trustee's apparent ownership of the beneficial interest in property to which it holds legal title. Requiring anything less would result in dangerous instability of titles. *Elyachar*, 583 F.Supp. at 922, *citing Young v. Young*, 80 N.Y. 422 (1880); *Hamer*, 124 N.Y. 538, 27 N.E. 256; *Tsai v. Tsai*, 39 A.D.2d 652, 331 N.Y.S.2d 691, 692 (1st Dept.1972); *Fontanella*, 33 A.D.2d at 312, 304 N.Y.S.2d at 831. Creditors can rely on that apparent ownership. But once that burden has been satisfied and the intention to separate beneficial ownership from legal title unequivocally shown, there would appear to be little reason to require more than that the evidence of the present nature of the trust be clear and convincing, that the intention of the parties be definitely identified. A similar test applies to the rule that, for a trust to be valid, the beneficiaries be capable of definite identification. *Trunkey v. Van Sant*, 176 N.Y. 535, 68 N.E. 946 (1903) (testator's intention as to beneficiaries of a testamentary trust must be "clear and positive"); 61 N.Y.Jur. § 275; *C.f. Ministers & Missionaries Board of Am. Baptist Convention v. McKay*, 64 Misc.2d 231, 315 N.Y.S.2d 549 (Sup.Ct.N.Y.Co.1970) (beneficiaries must be definitely ascertainable under New Jersey law). Consistent with that lesser showing is a requirement that proof that a present trust was intended need be clear and convincing once it is shown unequivocally and beyond a reasonable doubt, as here, that the settlor intended to form a trust. Accordingly, we hold that the clear and convincing standard applies and conclude, in light of all the writings, acts, and words of the parties, and the testimony, as enumerated *supra*, that the Defendants

met their burden of proof showing that a present trust of the Policies was intended. Although the assignment clause is inconsistent, the other evidence clearly and convincingly indicates an intention to form a present trust. That an alternative construction of the assignment clause, noted above is possible supports that conclusion.

Having concluded that a present trust of the insurance policies was formed in 1980, it follows that there was no transfer by Eljay of the proceeds of those policies in the year preceeding bankruptcy as required by § 548(a) of the Bankruptcy Code.[10]

### IV

■ The Trustee contends that notwithstanding the finding of a valid present trust, the Defendants cannot prevail because enforcing the trust would circumvent the proscription of BCL § 513. *E.g.*, Pl's Post–Tr.Mem., pp. 9–11.

BCL § 513(a) provides:

A corporation ... may purchase its own shares, or redeem its redeemable shares, out of surplus except when currently the corporation is insolvent or would thereby be made insolvent.

Barred are, not only repurchase agreements entered into when the corporation is insolvent but also, payments when the corporation is insolvent even though the agreement to make them was entered into when the corporation was solvent. *E.g., Flying Mailmen,* 539 F.2d at 869; *Cross v. Beguelin,* 252 N.Y. 262, 169 N.E. 378 (1929) (applying N.Y.Penal Law § 664). Payments made when a corporation is insolvent, although pursuant to a valid repurchase agreement, prefer shareholders over creditors and thereby prejudice the superior rights of creditors. *Flying Mailmen,* 539 F.2d 866; *In re Dawson Brothers Construction Co.,* 218 F.Supp. 411, 413 (N.D. N.Y.1963); *In re Dino & Artie's Automatic Transmission Co.,* 68 B.R. 264, 268 (Bankr.S.D.N.Y.1986). *See also, Reiner v. Washington Plate Glass Co. Inc. (In re Washington Plate Glass Co., Inc.),* 711 F.2d 414, 417 (D.C.Cir.1983) (construing

D.C. law); *McConnell v. Estate of Butler,* 402 F.2d 362, 366 (9 Cir.1968) (construing California law); *In re Charter Co.,* 63 B.R. 680, 683 (Bankr.M.D.Fla.1986) (construing Florida law).

In *Flying Mailmen* and *Dino,* the courts applied BCL § 513(a) to bar such payments even though they were secured by a security interest granted while the corporation was solvent. In *Flying Mailmen,* the court held the security interest invalid since the U.C.C. form reflecting that interest did not explicitly give notice to subsequent creditors that the collateral secured payments for the repurchase of stock.

In *Dino,* 68 B.R. at 269, this court held, without discussion of the question of notice, that a motion to vacate the automatic stay in bankruptcy to permit foreclosure of a mortgage to secure a repurchase agreement would be denied on the ground that the security interest falls if the underlying obligation becomes invalid, citing *Washington Plate Glass Co., Inc.,* 711 F.2d 414. The *Washington Plate Glass* court, however, expressly stated that it did not decide the notice point and observed that several cases, although criticized, have ruled that claims against insolvent corporations based on stock repurchase agreements would be honored if actual or constructive notice had been given that the collateral secured performance of a stock repurchase agreement. *Id.* 711 F.2d at 417 n. 8.

Here, unlike the usual case under § 513(a), the assets of the Corporation were not depleted by the payments of the insurance proceeds to the Mallas Estate in 1986, given our conclusion that the Phoenix Policies became subject to a valid *inter vivos* present trust in 1980. The Trustee does not contend that, if the trust was in place in 1980 and had a *res* consisting of the Phoenix Policies, the trust could not be supplemented by Eljay's obtaining the Connecticut Policy in 1983. It cannot be said, therefore, that the transfer of the insurance proceeds in 1986 was a transfer of corporate property. All that could be said

---

**10.** Section 548(a) of the Bankruptcy Code makes avoidable only those fraudulent transfers

by a debtor within the year preceeding bankruptcy.

is that Eljay may have transferred corporate property when it continued to pay the premiums on those policies in which it, in its own right, had no beneficial interest. The Trustee, however, has not shown the amount of those premiums or if any were paid while Eljay was insolvent.

For these reasons, it cannot be said, as the Trustee argues here, that the payment of the insurance proceeds to the Mallas Estate violated the statutory proscription of BCL § 513(a). Surely, Eljay repurchased its stock while insolvent; but Eljay did not prejudice the superior rights of creditors by diverting to a shareholder property rightfully belonging to those creditors.

Thus, this is a case where the Trustee's argument rests on the notion that BCL § 513(a) should be read to contain a broad proscription barring all corporate repurchases of stock when insolvent regardless of prejudice to creditors through use of corporate funds to make the repurchase. The New York Court of Appeals, in *Cross v. Beguelin*, however, rejected that notion. There, the court held that "The rights of the seller of the stock appear to be superior to those of subsequent creditors who became such with notice of the purchase of the corporation of its own stock." 252 N.Y. at 266, 169 N.E. at 379. Judge Friendly's decision in *Flying Mailmen* also argues against that notion. By carefully holding that notice of the obligation's being collateralized was insufficient and stating that the sentence from *Cross v. Beguelin* quoted above "remains viable," 539 F.2d at 870, Judge Friendly implicitly rejected a broader rule.

The reasoning in *Dino* however could be said to support a broader rule. Since the court did not follow Judge Friendly's notice analysis and address the question of the validity of the security agreement, it could be argued that *Dino* supports the proposition that all repurchases of stock while insolvent are barred. After all, since the

seller's security interest was obtained and perfected when the corporation in *Dino* was solvent, it could be argued that creditors would not be harmed by a subsequent payment for stock, although the corporation was insolvent, since the corporation would receive consideration in the form of a partial release of the collateral if the value of the security equalled or exceeded the debt.

To interpret *Dino* as standing for a broad proscription without regard to prejudice to creditors, however, is contrary to *Cross v. Beguelin* and *Flying Mailmen*. Dino is thus only a slender reed on which to found such a rule. Our task, like that of Judge Friendly in *Flying Mailmen*, is to construe BCL § 513(a) as the New York Court of Appeals would construe it. Since the statute remains unchanged after *Cross v. Beguelin* and *Flying Mailmen*, it appears that the Court of Appeals would find no broader proscription in a case where the repurchase was funded with life insurance proceeds held pursuant to a valid trust established by a corporation when it was solvent.[11]

For the above stated reasons, it is held that the transfers to the Mallas Estate are not avoidable under 11 U.S.C. §§ 544(b), 548 and 550(a). The foregoing constitutes this court's findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules. Judgment is to be entered in favor of the Defendants dismissing the complaint.

---

**11.** In so ruling, we recognize that *Cross v. Beguelin* and other knowledge cases have been criticized as "having an unfortunately circular character" since a creditor with knowledge may assume it still has priority. Herwitz, *Install-ment Repurchase of Stock: Surplus Limitations,* 79 Harv.L.Rev. 303, 316 (1965). *Flying Mailmen*, however, came after that criticism and here Eljay funded the purchase only in the amount of the premiums it had paid previously.