In the Matter of FLYING MAILMEN SERVICE, INC., Bankrupt.

Charles GOLD, Plaintiff-Appellant,

v.

Herbert K. LIPPMAN, Trustee in Bankruptcy of Flying Mailmen Service, Inc., Defendant-Appellee.

No. 887, Docket 75–5021.

United States Court of Appeals, Second Circuit.

Argued April 20, 1976.

Decided June 21, 1976.

Osmond K. Fraenkel, New York City (Seymour M. Heilbron, Elias Messing, and Hays, St. John, Abramson & Heilbron, New York City, of counsel), for appellant.

Stephen J. Mydanick, New York City (Karl S. Lowenthal, New York City, of counsel), for appellee.

Before FRIENDLY, HAYS and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

On September 18, 1970, appellant Charles Gold began an action in the Supreme Court for New York County in which he sought the dissolution of Flying Mailmen Service, Inc. (the "Corporation"), 49% of whose shares he owned, the restraining of that corporation's officers and directors from withdrawing any corporate funds, and the appointment of a receiver pending the dissolution. The court entered an order granting this relief *in toto*. While an appeal was pending, the Corporation and Gold entered into an agreement dated December 16, 1970 whereby Gold's claims would be compromised and his stock repurchased by the Corporation.

The agreement provided that the Corporation would pay Gold $150,000 of which 17% was allocated to the settlement of any claims by Gold against the Corporation and 83% was to pay for the purchase of Gold's shares. The Corporation paid $57,000 upon the execution of the agreement; the balance was to be paid in 18 bi-monthly installments of $5,138.88, beginning March 1, 1971.

Paragraph 6 of the agreement provided that the Corporation granted to Gold "as security for the payment of the balance of the Purchase Price security interests in all of the assets owned" by the Corporation. Paragraph 14 provided that Gold would deliver his stock certificates to a third party (actually the former temporary receiver) to be held in escrow until the Purchase Price was paid; paragraph 15 directed the escrow agent, in the event of default, to sell the shares deposited in escrow by Gold if necessary to retire any balance unsatisfied by the proceeds realized by Gold on his security. Paragraph 22 provided that "Title and all rights of ownership in and to the shares of Flying Mailmen held in escrow by [the escrow agent] and deposited by Gold shall be deemed transferred to Flying Mailmen as of the date of the execution of this agreement. . . . " It further provided that as of the date of the agreement "Gold shall have no rights or ownership of the shares of Flying Mailmen so deposited by him in escrow, nor shall he be deemed to have the rights of a shareholder of Flying Mailmen."

In January 1971, Gold filed a financing statement pursuant to New York's U.C.C. § 9–403.[1] The financing statement did not state that the agreement secured was, in part, a repurchase of stock by a corporation; however, it did make the following answer with respect to property covered:

> This Financing Statement has been executed pursuant to an agreement, dated December 16, 1970, between Charles Gold, the Secured Party, and Flying Mailmen Service, Inc., Park Avenue Mail Service, Inc. and other parties, Debtors, granting to Gold security interests in all of the assets owned by debtor Flying Mailmen Service, Inc. and to be owned by said debtor in the future. It includes

accounts receivable, fixtures and equipment, motor vehicles and all other assets now owned or to be owned in the future. The motor vehicles presently included consist of a 1970 Dodge Van, Serial No. A12ABOU125 627, Model No. A100, and a 1970 Dodge Wagon, Serial No. A12ABOU124 048, Model No. A100.

Gold had received approximately $83,000 under the agreement when, on February 17, 1972, the Corporation filed a petition under Chapter XI of the Bankruptcy Act. Gold instituted a proceeding in the Bankruptcy Court for the enforcement of the security agreement upon default by the Corporation. This proceeding came before Bankruptcy Judge Herzog while the Corporation was in Chapter XI. Before an order was entered on Judge Herzog's decision of June 19, 1972, denying Gold's claim, a compromise was entered into by Gold and the Corporation, the debtor in possession. This was approved by an order of the Bankruptcy Judge, which was in turn reviewed by the District Court on a petition by creditors. Prior to the completion of the District Court review, the Corporation was adjudicated a bankrupt and the petition was remanded to the Bankruptcy Judge.

On remand the Trustee sought to challenge the underlying settlement and repurchase agreement as invalid at the time it was made, but that contention was not considered by the Bankruptcy Judge. He refused to enforce the original agreement or the security interest created by it, holding that since, under applicable New York law a corporation may not purchase its own stock when it has become or would thereby become insolvent, the provisions of the agreement by which the Corporation had agreed to repurchase its stock had become

---

1. In further study of the case after argument we noticed that the financing statement, a copy of which was included in the appendix, described as the debtor Park Avenue Mail Service, Inc., a wholly-owned subsidiary of Flying Mailmen. At our request the Clerk addressed a letter asking counsel to comment on this unless the Trustee was willing to waive the point. Counsel for appellant supplied a letter dated May 18, 1976 in which he stated that a financing statement carrying the proper name had been filed with the Secretary of State and that he trusted this took care of the problem. By letter dated May 21, 1976 counsel for the Trustee waived "the fact that the wrong financing statement was placed in the appendix and that the same can be treated to read Flying Mailmen Service, Inc., rather than Park Avenue Mail Services, Inc."

unenforceable and that the security interest "given to secure an unenforceable obligation, is likewise unenforceable." He further held that, despite the financing statement, the balance of the debt to Gold for the price of the stock constituted an unsecured claim subordinated to the claims of all general creditors. Gold was ordered to refund money paid to him with respect to the stock after the date on which the debtor had filed a petition in bankruptcy.

On a petition to review, the District Court for the Southern District of New York affirmed, to the extent that it denied Gold's status as a secured creditor with respect to payment for the stock, but remanded the case to allow the Bankruptcy Judge to determine the date of the Corporation's insolvency so as to fix the amount repayable by Gold and also to permit the Trustee to move to amend his answer to challenge the validity of the original agreement as unconscionable. *Matter of Flying Mailmen Service,* 402 F.Supp. 790 (S.D.N.Y. 1975). Gold has appealed.

■ Section 513(a) of the New York Business Corporation Law states that:

A corporation, subject to any restrictions contained in its certificate of incorporation, may purchase its own shares, or redeem its redeemable shares, out of surplus except when currently the corporation is insolvent or would thereby be made insolvent.

The language "except when *currently* the corporation is insolvent" (emphasis supplied) strengthens the view that installment payments may not be made in a situation of insolvency even though, as here, the agreement itself may have been made when the corporation had a surplus sufficient to cover the entire purchase price, and title to the stock has been transferred. *Cf. Mantell v. Unipak Aviation Corp.,* 28 A.D.2d 1134, 284 N.Y.S.2d 640 (1967); *Nakano v. Nakano McGlone Nightingale Advertising, Inc.,* 84 Misc.2d 905, 377 N.Y.S.2d 1001 (1975).[2]

Not arguing otherwise, appellant relies on *Cross v. Beguelin,* 252 N.Y. 262, 265, 169 N.E. 378 (1929), a case arising prior to enactment of § 513 and governed by § 664 of the New York Penal Law.[3] In *Cross,* the Court of Appeals held that, although the initial agreement was valid and title to the stock had passed but full payment had not yet been made,

After the corporation became financially embarrassed and the surplus shrank to a

---

**2.** The district court did not rely solely on § 513 but also cited § 514(b) which provides:

The possibility that a corporation may not be able to purchase its shares under section 513 shall not be a ground for denying to either party specific performance of an agreement for the purchase by a corporation of its own shares, if at the time for performance the corporation can purchase all or part of such shares under section 513.

The enactment of § 514(b) was not, however, an effort to put further teeth into § 513(a) but rather was intended to overrule *Topken, Loring & Schwartz v. Schwartz,* 249 N.Y. 206, 163 N.E. 735 (1928). In that decision the Court of Appeals had refused to grant specific performance in an action by a corporation to enforce an agreement for the purchase of stock from an employee at the termination of his employment on the ground that the contract lacked mutuality of obligation since the corporation's promise was necessarily conditioned on its having a surplus when the employment ended, something not within the corporation's control. Section 514(b) would seem to have the further result of permitting enforcement of a contract

that was invalid under § 513(a) when made but could be carried out consistently with that section when the time for performance had arrived. Section 514(b) does not speak to the situation here, where the contract was valid when made but could not be performed consistently with § 513(a) due to supervening insolvency and § 514(a) makes it clear that § 513(a) is unaffected in that situation.

**3.** This section made it a misdemeanor for a director to concur in any vote or act by which it is intended "to apply any portion of the funds of such corporation, except surplus, directly or indirectly, to the purchase of shares of its own stock." Section 664 was replaced by § 190.-35(1)(e) of the Penal Law which provided that:

A person is guilty of misconduct by corporate official when:

1. Being a director of a stock corporation he knowingly concurs in any vote . . . by which it is intended:

. . . (e) to apply any portion of the funds of such corporation, directly or indirectly, to the purchase of shares of its own stock except in the manner provided by law.

deficit, the agreement became unenforceable against the corporation.[4]

But the court went on to say,

However, this claim is not against the corporation. It is directed against assets in possession of a creditors' committee. The corporation, for all that the submission shows, is still a going concern with the ownership of all the stock in the possession of [a subsequent purchaser]. The corporation appears to have no interest in this controversy. * * * [T]he real issue now is between between Ferdinand Cross, as a prior creditor, and the Beguelin estate, as a subsequent creditor for salary arrears and also as a holder of preferred stock. The rights of creditors are, of course, superior to those of stockholders. The rights of the seller of the stock appear to be superior to those of subsequent creditors of the corporation who became such with notice of the purchase by the corporation of its own stock.

252 N.Y. at 265–66, 169 N.E. at 379 (citations omitted). The first three sentences of the quoted paragraph may not have survived enactment of § 513; in any event, in light of *In re Fechheimer Fishel Co., supra,* 212 F. 357, see note 4, we consider them inapplicable to a trustee in bankruptcy. The portion after the asterisks, however, continues to be viable. The question is what it means.

In *Cross* there were no general creditors or unpaid claims except claims for salary of officers and directors who had represented the corporation in the making of the stock repurchase contract and whose claims for salary accrued subsequent to the agreement; Beguelin had not merely "notice" but actual knowledge of the repurchase contract.

■■ Gold would have us decide in the present case that the "notice" provided by his filing of a financing statement perfecting his security interest as required by N.Y. U.C.C. §§ 9–402 and 9–403 constitutes "no-

tice of the purchase by the corporation of its own stock" to subsequent creditors within the meaning of *Cross*. With full appreciation of the excellent argument of Gold's counsel and of the considerations powerfully urged in our brother Mulligan's dissent, we are constrained to hold otherwise.

As stated, in *Cross* there was actual knowledge by the later creditor, and the statement that "notice" would suffice was in a sense dictum. Some idea of what the Court of Appeals may have meant by "notice" is conveyed by the case which it cited, *First Trust Co. v. Illinois Central R. Co.,* 256 F. 830 (8th Cir.), *cert. denied,* 249 U.S. 615, 39 S.Ct. 390, 63 L.Ed. 803 (1919). That case dealt with a recorded mortgage which recited the nature of the underlying agreement, *viz.,* that it was a stock repurchase contract. We have been referred to no other case in which the claims of creditors were subordinated to a security for a stock repurchase agreement which had become illegal that did not involve knowledge of the agreement on the part of subsequent creditors, see *Huron Milling Co. v. Hedges,* 257 F.2d 258, 263 (2 Cir. 1958). While we must take the language of *Cross* to mean that something less than actual knowledge may suffice, we see no policy reason to strain to hold that the mere filing of a financing statement affording no indication that the agreement secured is a stock repurchase agreement will suffice.

■ In contrast to the normal valid commercial transactions for which U.C.C.'s innovation of notice filing was devised, a repurchase of stock depletes a corporation's assets without any consideration of value to creditors moving to the corporation in return. Such cases as there are reflect a recognition of the unusual character of such transactions and hence suggest a distinction between the notice required to prevent subsequent creditors from challenging a security created in connection with an obligation that was and remains valid and the notice

**4.** The Court of Appeals cited with approval *In re Fechheimer Fishel Co.,* 212 F. 357 (2 Cir.), *cert. denied,* 234 U.S. 760, 34 S.Ct. 777, 58 L.Ed. 1580 (1914), a bankruptcy case in which

this court had subordinated the claim of a selling stockholder on an unsecured note to claims of general creditors.

required to subordinate subsequent creditors to a lien securing an obligation that is no longer enforceable against the corporation.

In *In re Dawson Bros. Construction Co.,* 218 F.Supp. 411 (N.D.N.Y.1963), a corporation had taken appropriate action to reduce its capital to reflect a stock repurchase and had filed documents "in the proper offices as notice of the action taken." 218 F.Supp. 413. The corporation had not, however, in these documents or in any others indicated that a debt remained to be paid on the repurchase agreement. Conceding that

> Without doubt, [a] subsequent creditor having notice of the impairment of a corporation's capital structure who thereafter extends credit is charged with the notice and effect of such impairment,

*id.,* the court nevertheless refused to apply this principle when there was no proof that subsequent creditors had notice of the deferred payments. Stating that there was

> affirmative evidence that the creditors had no knowledge of the existence of the outstanding notes [the court held that creditors] then had the right to rely upon the stated capital as a trust fund for their protection.

*Id.*

A decision still closer to the point and more authoritative is *In re Bay Ridge Inn,* 98 F.2d 85, 87 (2 Cir. 1938). There, in refusing to subordinate the claims of general creditors to a note secured by a chattel mortgage which had been given to stockholders who had sold their stock to a third person and rejecting the argument that the filing of the mortgage should serve as constructive notice to subsequent creditors, Judge A. N. Hand wrote,

> On its face the mortgage indicated a consideration moving to the corporation. Indeed the resolution only authorized the corporation to borrow the $2,025 from the petitioners and to execute the mortgage as security for such a loan. The loan was never made and the mortgage was used not to obtain funds for the corporation, but only to give the mortgagees security when they sold their stock. The record

gave no notice to creditors of what actually occurred. Creditors who examined the record would have had reason to suppose that the corporate assets were augmented by the amount of a loan of $2,025, instead of being depleted by payments to the mortgagees.

It is true that *Dawson Brothers Construction Co., supra,* and *In re Bay Ridge Inn, supra,* do not control our decision here. *Dawson Brothers,* as stated, involved the adequacy of a notice of reduction of capital and *Bay Ridge,* which arose long before the birth of the U.C.C., was considered to involve the problem of a sham dividend and was therefore decided under former § 58 of the New York Stock Corporation Law. However, they do display a recognition that the "notice" requirement is not the same for all purposes and in all circumstances, and that notice adequate under the U.C.C. to protect valid liens arising from normal commercial transactions will not suffice to afford the benefits which *Cross* accorded in some circumstances even to a contract to deplete corporate assets for the repurchase of stock whose enforcement has become illegal. The significant distinction is that whereas the U.C.C. is concerned with claims enforceable against the debtor, *Cross v. Beguelin* relates to an obligation that has become unenforceable. It creates a special exception in favor of the obligee against those creditors who, because of special circumstances, cannot in good conscience be allowed to prevail against him.

We fully recognize the importance of not embroidering qualifications on the U.C.C.'s scheme of notice filing. We simply regard the U.C.C. provisions as inapplicable and insufficient to a case where the holder of an obligation requiring the payment of corporate funds for its own stock, performance of which has become illegal because of the corporation's insolvency, seeks to avail himself of the narrow exception, created in *Cross v. Bequelin,* that he may nevertheless enforce his security against persons who have "notice" of the existence of a claim to which the debtor no longer can legally respond. We read the decision of the Court

of Appeals in *Cross* as requiring more in the way of "notice" than an indication that an agreement of some sort exists; we do not think that when New York adopted the U.C.C., it intended to broaden the *Cross* exception.

The judgment of the district court is affirmed insofar as it held the security agreement unenforceable in priority to the claims of subsequent creditors. The case is remanded to the district court to remand to the bankruptcy judge for further proceedings including determining the date of insolvency and entertaining the motion by the Trustee to amend his answer so as to ask that the entire settlement and repurchase agreement be declared unconscionable.

MULLIGAN, Circuit Judge (dissenting):

I respectfully dissent. I cannot agree that the filing of the financing statement here, which fully complies with N.Y.U.C.C. § 9–402, does not constitute notice to subsequent creditors of Gold's security interest arising from the purchase by the corporation of his shares of stock. The majority opinion requires that the financing statement, in addition to the minimal requirements set forth in section 9–402,[1] also indicate that the underlying transaction is a stock repurchase agreement. There is no such requirement in the Uniform Commercial Code and there is no, authority in any

decision construing Article 9 which would even suggest that such additional information be included in the financing statement.

The entire thrust of Article 9 of the Code was to eliminate a transaction recording system which had proved to be unwieldy and ineffective and to replace it with a simplified and unified system of notice filing. 1 Gilmore, Security Interests in Personal Property 462–71 (1965). There is no dispute that section 9–402 was complied with here.[2] The majority in effect is amending the Code by imposing an additional requirement contrary not only to the letter but also to the spirit and intent of Article 9.

The majority suggests that the U.C.C.'s innovation of notice filing was intended to cover a normal valid commercial transaction, and not a stock repurchase agreement which depletes corporate assets without any consideration of value moving to the corporation. While this distinguishes the security interest of Gold here from the usual financing agreement, it by no means follows that the security interest created by the agreement is not governed by the requirement of section 9–402. On the contrary, the intent of the draftsmen of the Code, which was fully studied and reported by the Law Revision Commission of the State of New York,[3] is amply demonstrated by the language of section 9–402 [4] which

1. § 9–402(1) provides in relevant part:
   A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral. . . .

2. While it is true that a copy of the security agreement itself is sufficient as a financing statement if it supplies the information specified by section 9–402 and is signed by both parties (4 Anderson, Uniform Commercial Code § 9–402:b (2d ed. 1971)), it is of course not required but is an alternate procedure. *National Cash Register Co. v. Firestone & Co.*, 346 Mass. 255, 191 N.E.2d 471, 475 (1963).

3. 2 Report of the Law Revision Commission, Hearings on the Uniform Commercial Code 1011–214 (1954).

4. *"§ 9–102. Policy and Scope of Article*

   (1) Except as otherwise provided in Section 9–103 on multiple state transactions and in Section 9–104 on excluded transactions, this Article applies so far as concerns any personal property and fixtures within the jurisdiction of this State
   (a) *to any transaction (regardless of its form)* which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; and also
   (b) to any sale of accounts, contract rights or chattel paper.
   (2) This article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention

makes Article 9 applicable to *any* transaction *regardless of its form* which is intended to create a security interest. The agreement here involved was intended to create such an interest in Gold and the fact that it arose from a stock repurchase agreement is not relevant. Professor Gilmore has observed that where counsel is confronted with a novel situation,

> whatever name he may give to the documents he drafts, he will end up, if the "transaction" is one "intended to create a security interest," within an Article 9 security interest, subject to the Article 9 rules, the Article 9 metaphysics and, *most importantly, the Article 9 filing system.*

1 Gilmore, *supra* at 296 (emphasis supplied).

Not only is a security interest arising from a stock repurchase agreement not excluded by the language of Article 9, but the observation has been made that "[t]he Code permits for all types of collateral the 'notice' filing which New York has heretofore permitted only for inventory—the Uniform Trust Receipts Act; Factors Lien Act; and the Dealer's Chattel Mortgage Act." Coogan, How to Create Security Interests Under the Code—And Why, 48 Cornell L.Q. 131, 150 (1962) (footnotes omitted). See also Coogan, A Suggested Analytical Approach to Article 9 of the Uniform Commercial Code, 63 Colum.L.Rev. 1, 23 (1963). In sum, a reading of the Code and the commentators leads inescapably to the conclusion that all transactions intended to create security interests are subject to the filing requirements of Article 9, which were fully followed here.

I further fail to find any overreaching or inequity in the notice filing here employed. The financing statement explicitly stated, "This Financing Statement has been executed pursuant to an agreement, dated December 16, 1970, between Charles Gold, the Secured Party, and Flying Mailmen Service, Inc. . . ." As was stated in *Beneficial Finance Co. v. Kurland Cadillac-Oldsmobile,*

*Inc.,* 32 A.D.2d 643, 300 N.Y.S.2d 884, 887 (2d Dept. 1969):

> The purpose of a notice-filing statute is to give protection to a creditor by furnishing to others intending to enter into a transaction with the debtor a starting point for investigation which will result in fair warning concerning the transaction contemplated.

(citations omitted). See also *Marine Midland Bank v. Conerty Pontiac-Buick, Inc.,* 77 Misc.2d 311, 352 N.Y.S.2d 953, 958 (Sup.Ct. Albany Cty.1974); *John Deere Co. v. William C. Pahl Construction Co.,* 59 Misc.2d 872, 300 N.Y.S.2d 701, 703 (Sup.Ct. Onondaga Cty.1969), aff'd, 34 A.D.2d 85, 310 N.Y.S.2d 945 (4th Dept.1970); *Bank of Utica v. Smith Richfield Springs, Inc.,* 58 Misc.2d 113, 294 N.Y.S.2d 797, 799 (Sup.Ct. Oneida Cty.1968).

The intent behind the filing requirements of Article 9 has received recognition from the federal courts as well. In *In re Excel Stores, Inc.,* 341 F.2d 961 (2d Cir. 1965), Judge Medina noted that under pre-Code law, the slightest deviation from statutory requirements often resulted in the invalidation of security interests.

> The result was the scrapping of the old statutory scheme, which varied from State to State, and the substitution for it of the filing of a simple notice the purpose of which is only to "give the minimum information necessary to put any searcher on inquiry."

Id. at 963. See also *In re Grandmont,* 310 F.Supp. 968, 971 (D.Conn.1970). Any subsequent creditor was clearly alerted to the agreement of December 16, 1970 between Gold and the corporation, which was the stock repurchase agreement giving rise to the security interest. It was an obvious lead to the underlying transaction which would hardly require the investigative talents of a Sherlock Holmes or Inspector Maigret to unearth.

---

contract and lease or consignment intended as security. This Article does not apply to statutory liens except as provided in Section 9–310.

(3) The application of this Article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply." (emphasis supplied). The exclusions in 9–103 and 9–104 are not applicable here.

874

*Cross v. Beguelin,* 252 N.Y.262, 169 N.E. 378 (1929) does not require that the obligation created by the stock repurchase agreement remain valid and enforceable against the corporation. It simply requires that the subsequent creditor have notice of the transaction. The real issue was between the seller of the stock and the subsequent creditor and there the court announced the rule, "The rights of the seller of the stock appear to be superior to those of subsequent creditors of the corporation who became such with *notice* of the purchase by the corporation of *its own stock.*" 252 N.Y. at 266, 169 N.E. at 379 (emphasis supplied). While the creditor in *Cross* had actual knowledge of the repurchase agreement, the majority concedes that something less than actual knowledge may suffice. Here the subsequent creditor is bound by the filing of the financial statement which identified the transaction creating the security interest. There is nothing in the Code or the cases which requires that it designate the underlying arrangement as a "stock repurchase agreement." As I have indicated, the nature of the underlying transaction is not important—Article 9 of the Code was intended to apply to any and all security interests.

I conclude therefore that *Cross* and the Code were satisfied here and that it is inappropriate for this court to engraft further filing requirements on Article 9 which was a well-conceived, thoroughly studied and all-embracive codification of state law.