**In re SPM MANUFACTURING CORPORATION, Debtor.**

**Bankruptcy No. 89–40287–JFQ.**

United States Bankruptcy Court, D. Massachusetts.

Feb. 23, 1994.

Eugene Berman, Kamberg, Berman, P.C., Springfield, MA, for Official Unsecured Creditors' Committee.

Robert Cunningham, Robinson Donovan Madden & Barry, P.C., Springfield, MA, for Shaine Foundation.

L. Jed Berliner, Springfield, MA, for Deloitte, Haskins and Sells.

Peter A. Zisser, LeBoeuf, Lamb, Leiby and MacRae, New York City, for John S. Pereira.

David Sinish, pro se.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

This case raises the following question: If a corporation in sound financial condition delivers a promissory note for the purchase of its own stock, should the balance due on the note be equitably subordinated to other unsecured debt when the corporation later becomes insolvent and goes into bankruptcy years later? The question has particular significance for close corporations because

they frequently make such stock purchases at the death or retirement of a principal stockholder. It also involves a conflict between the Bankruptcy Code and Massachusetts corporate law. I answer the question in the affirmative.

## I. FACTS

The Shaine Foundation (the "Claimant") has filed an unsecured claim in the sum of $542,246.96. The Official Unsecured Creditors' Committee (the "Committee") objects to the claim, contending it should be subordinated under principles of equitable subordination. Although subordination should be litigated in an adversary proceeding, Fed. R.Bankr.P. 7001, the Claimant does not raise this point of procedure. I elide it for this reason and also because there is no factual dispute suitable to resolution in an adversary proceeding.

The claim is for the balance due under a note dated May 27, 1982 for $662,925, which SPM Manufacturing Corporation (the "Debtor") delivered in connection with redemption of its stock owned by the Claimant. The Claimant is a charitable trust controlled by members of the Shaine family, who are also the Debtor's stockholders, directors and officers. In 1978, a member of the Shaine family bequeathed the Claimant shares of the Debtor's capital stock. In May of 1982, the Claimant sold to the Debtor 3,240 shares of the Debtor's preferred stock, at $30 per share, and 1,500 shares of the Debtor's Class B Common stock, at $377.15 per share, delivering the note in question for the full purchase price. The Debtor retained the purchased shares as treasury stock. The note, which bears interest at the rate of 12% per year, is payable over 15 years in equal monthly installments of $7,956.26. It contains no subordination provisions, and as a result of payment default is now payable in full.

The Debtor, a Massachusetts corporation, was in the business of manufacturing items such as calendars and wedding albums, with a main office in Holyoke, Massachusetts. The Debtor's certified financial statements of December 31, 1982 disclose a net worth of $2,988,916 after deduction of $1,679,682 for redeemed shares including the shares purchased through delivery of the note. During 1982, the Debtor earned $433,957, net of taxes, and in 1983 it earned $267,037, net of taxes, after having recently changed to a LIFO (last-in, first-out) system of accounting. If the Debtor had continued to report its income on a FIFO (first-in, first-out) basis, its 1982 net income would have been $583,855. At the end of 1982, the Debtor's current assets exceeded its current liabilities by $3,144,294. It is now in liquidation under chapter 7. It is without surplus and unable to pay its debts in full even if this claim is subordinated.

## II. PRINCIPLES OF EQUITABLE SUBORDINATION

The Committee requests subordination of the claim under principles of equitable subordination. Those principles, applicable only in bankruptcy, are traditionally based upon inequitable conduct of a claimant who is an insider of the debtor.[1] Subordination is not warranted by the mere fact the claimant is a stockholder; the claimant must have been guilty of some type of wrongful action.[2]

The Committee asserts no inequitable conduct on the part of the Claimant or members of the Shaine family who control the Claimant. I assume for purposes of this opinion that the purchase transaction is not voidable under fraudulent transfer law and complied with Massachusetts corporate law. Based upon the circumstances existing in 1982, the redemption does not appear to have jeopardized the Debtor's existence.

A corporation's redemption of its own stock is in essence a dividend for which the

---

1. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977).

2. *Comstock v. Group of Institutional Investors,* 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911 (1948).

corporation receives no consideration.[3] When the transaction is so viewed, an argument could perhaps be mounted that the act of creating redemption debt is itself inequitable. But this would prove too much in light of the important role played by stock redemptions in the world of close corporations. And we are dealing with a transaction which was presumptively valid under fraudulent transfer law and corporate law.

The Committee relies solely on the fact the claim arises from redemption of the Debtor's stock. Whether this is sufficient to equitably subordinate the claim requires a close examination of section 510(c) of the Bankruptcy Code and its legislative history.

Section 510(c) provides that "the court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...."[4] The House report states: "This section is intended to codify case law, such as *Pepper v. Litton* ... and *Taylor v. Standard Gas and Electric Co.* ... and is not intended to limit the court's power in any way. The bankruptcy court will remain a court of equity."[5] This legislative history could be read to indicate a court is authorized to subordinate a claim only by reason of the claimant's misconduct under facts such as those present in *Pepper* and *Taylor*. On the other hand, the report's disavowal of any intent to limit the court's equitable powers might indicate Congress did not intend to restrict the grounds for equitable subordination.

The Senate report is equally ambiguous on this point. It says: "These principles [of equitable subordination] are defined by case law, and have generally indicated that a claim may normally be subordinated only if its holder is guilty of misconduct."[6]

■ Statements made on the floor of the House and Senate go much further. They say:

> It is intended that the term "principles of equitable subordination" follow existing case law and leave to the courts the development of that principle. To date, under existing case law, a claim is generally subordinated only if [the] holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor.[7]

Here we have an express indication of Congressional intent that courts have the power to subordinate a claim because of its nature or origin. Floor statements made by individual members of Congress are of course less authoritative than committee reports. But the committee reports here are ambiguous. And there was no conference report. Statements made on the floor were a substitute for a conference report. Taking all this into consideration, I conclude from these references to penalty claims and security claims that Congress intended courts to have the power to equitably subordinate claims because of their nature or origin. Decisions equitably subordinating penalties or punitive damage claims in chapter 11 have come to this conclusion based on the same legislative history.[8] They reject the need for creditor misconduct and subordinate such claims because to allow them parity with other claims would penalize creditors for the debtor's misconduct.[9]

---

3. *E.g., Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 982 (1st Cir.1983); *Gold v. Lippman (In re Flying Mailmen Serv., Inc.)*, 539 F.2d 866, 870 (2d Cir.1976); *Robinson v. Wangemann*, 75 F.2d 756, 757 (5th Cir.1935).

4. 11 U.S.C. § 510(c) (1988).

5. H.R.Rep. No. 595, 95th Cong., 1st Sess. 359 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6315.

6. S.Rep. No. 989, 95th Cong.2d Sess. 74 (1978), *reprinted in,* 1978 U.S.C.C.A.N. 5787, 5860.

7. 124 Cong.Rec. H11,095 (daily ed. Sept. 20, 1978); S17,412 (daily ed. Oct. 6, 1978), *reprinted in,* 1978 U.S.C.C.A.N. 5787, 5963, 6315, 6436.

8. *E.g., In re Virtual Network Services Corp.*, 902 F.2d 1246 (7th Cir.1990).

9. *Id. See also Burden v. United States (In re Burden)*, 917 F.2d 115 (3d Cir.1990) (court persuaded by floor statements that Congress intended courts to be able to equitably subordinate tax penalty claim in chapter 13 by reason of the nature of the claim; case remanded for trial court to consider equities, which need not include claimant misconduct).

Several decisions rendered under the prior Bankruptcy Act subordinated redemption debt by reason of its source and without reliance on state statutes regulating stock redemptions, which are discussed later. *Robinson v. Wangemann*[10] is perhaps the best known of this genre. The court stressed that redemption is merely a method for a corporation to make a distribution to a stockholder, and the corporation acquires nothing of value in return. In subordinating the claim because of its source, the court said:

> The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them unless creditors are paid in full. When such a transaction is had regardless of the good faith of the parties, it is essential to its validity that there be sufficient surplus to retire the stock, without prejudice to creditors, at the time payment is made out of assets. . . . It is necessary to a recovery that the corporation should be solvent and have sufficient surplus to prevent injury to creditors when the payment is actually made. This was an implied condition in the original note and the renewals.[11]

*Robinson v. Wangemann* is a policy statement that redemption debt must come behind general creditors in bankruptcy because of the priority creditors enjoy in bankruptcy over stockholders. Other courts, including the court of appeals of this circuit, also adopted this position under the Act.[12]

Decisions under the Code have taken the same view. In *Liebowitz v. Columbia Packing Co.*,[13] the court believed it immaterial that the corporation was solvent or had sufficient surplus at the time the obligation to pay for the redeemed stock was incurred. The court equated a redemption claim with stockholder status, stating: "The underlying nature of the transaction survives, and the note remains an equity obligation."[14] Finding the debtor insolvent both when the redemption note became payable and when the trustee's subordination claim was asserted, the court subordinated the note to all unsecured claims. The court made no mention of any applicable corporate redemption statute. It relied upon its powers under principles of equitable subordination, but without discussion of why wrongful conduct by the claimant was unnecessary. Some courts agree with *Liebowitz* that the origin of stock redemption debt justifies its equitable subordination.[15] Others decline to subordinate the debt on the ground equitable subordination requires misconduct on the part of the claimant.[16]

Subordination of redemption debt raises policy considerations which are similar to those present in the subordination of damage claims arising from the purchase or sale of the debtor's stock, such as a claim for violation of the securities laws in issuance of the stock. Section 510(b) of the Code expressly subordinates such security claims to the claims of other creditors.[17] In a case decided under the prior Act, the Second Circuit subordinated claims for security law violation under principles of equitable subordination.[18] This reflects the thinking that only share-

**10.** 75 F.2d 756 (5th Cir.1935).

**11.** *Id.* at 757–58.

**12.** *E.g., In re Hawaii Corp.,* 694 F.2d 179 (9th Cir.1982) (court stated it was following 9th Circuit *McConnell* decision, but subordinated debt without reference to state statute, in reliance on *Robinson* ); *Matthews Bros. v. Pullen,* 268 F. 827, 828 (1st Cir.1920) (court stating, without reference to any corporate statute, stockholder cannot through executory contract "cease to be a stockholder, and become a creditor, to share in competition with other creditors in the assets of the corporation when bankrupt.").

**13.** 56 B.R. 222 (D.Mass.1985), *aff'd per curiam,* 802 F.2d 439 (1st Cir.1986).

**14.** *Id.* at 224.

**15.** *E.g., In re Dino & Artie's Automatic Transmission Co., Inc.,* 68 B.R. 264 (Bankr.S.D.N.Y.1986).

**16.** *In re Stern–Slegman–Prins Co.,* 86 B.R. 994, 1000 (Bankr.W.D.Mo.1988).

**17.** 11 U.S.C. § 510(b) (1988).

**18.** *Jezarian v. Raichle (In re Stirling Homex Corp.),* 579 F.2d 206 (2d Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979).

holders should bear the risk of fraud or other illegality in the issuance of shares.[19] Assigning the risk to shareholders is justified on the ground that only shareholders have the ability to participate in profits.[20] Subordination of claims arising from purchase or sale of the debtor's stock is likened to subordination of stock to debt under the absolute priority rule.[21]

Much the same considerations justify subordination of redemption debt. Indeed, there is more reason for subordination of redemption debt than subordination of damage claims arising from stock purchase. A stock purchase claimant is attempting to recover only the cost of his investment, whereas a stock redemption claimant is usually seeking profit in the sale of the stock. A redemption claimant, moreover, is trying to recover what is essentially a liquidating dividend on his stock. And because of the absence of consideration, prior payments on the claim will have contributed to the debtor's financial collapse. I conclude that this claim must be equitably subordinated for these reasons.

The argument against subordination of redemption debt analogizes redemption on credit to redemption for cash coupled with a loan back to the corporation. If the cash redemption and loan back would have been valid under corporate law and fraudulent transfer law, the argument runs, why should redemption debt be different?[22] The answer is two-fold. First, a redemption with an immediate loan back should be integrated into one transaction consisting of a redemption on credit, because the parties presumably contemplated both transactions from the beginning. Second, likening redemption on credit to a cash redemption and loan back misses the point. Loan debt is not redemption debt. The question to be decided is the relative priority which redemption debt and other debt should enjoy under principles of equitable subordination based upon their respective natures.

### III. MASSACHUSETTS CORPORATE LAW

Many courts look, at least initially, to state corporate law in passing upon the validity and priority of stock redemption claims in bankruptcy. Corporation statutes typically restrict the price of the redemption to the corporation's surplus, prohibiting redemption out of capital. In a redemption on credit, the courts examine the applicable statute to see if it prohibits payment, as well as purchase, out of capital. If the statute does prohibit payment out of capital, these courts subordinate the claim to all other claims.[23] In so interpreting the statute, the courts construe the debtor's promise of payment to be conditional upon the debtor having sufficient sur-

---

19. H.R.REP. No. 595, 95th Cong. 1st Sess. 194–96 (1977), *reprinted in,* 1978 U.S.C.C.A.N. 5787, 6154–6157. *See* John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors,* 48 N.Y.U.L.REV. 261 (1973).

20. *Id.*

21. *Id.*

22. *See* David R. Herwitz, *Installment Repurchase of Stock: Surplus Limitations,* 79 HARV.L.REV. 303 (1965). *See also Wolff v. Heidritter Lumber Co.,* 112 N.J.Eq. 34, 163 A. 140 (Ch.1932) (upholding validity of redemption debt in corporation's liquidation because transaction equivalent in substance to permissible cash purchase with loan back to corporation).

23. *E.g., La Grand Steel Products Co. v. Goldberg (In re Poole, McGonigle & Dick, Inc.),* 796 F.2d 318 (9th Cir.1986), *opinion amended,* 804 F.2d 576 (9th Cir.1986) (statute prohibited purchase "or payment for" corporation's own shares when purchase "or payment" would make it insolvent); *Gold v. Lippman (In re Flying Mailmen Service, Inc.),* 539 F.2d 866 (2d Cir.1976) (statute permitted purchase of own shares "except when currently the corporation is insolvent or would thereby be made insolvent"); *McConnell v. Butler,* 402 F.2d 362 (9th Cir.1968) (statute permitted "payment" to extent of current earned surplus); *In re Trimble Co.,* 339 F.2d 838 (3d Cir. 1964), *appeal after remand,* 479 F.2d 103 (3d Cir.1973) (statute unspecific on time purchase is measured against surplus; court construed it to apply to time of payment). *See also Mountain State Steel Foundries, Inc. v. C.I.R.,* 284 F.2d 737 (4th Cir.1960) (statute permitted corporation to "use its funds" for purchase of own shares when this would not cause impairment of capital; court held interest deductions permissible so long as capital not impaired).

plus at the time of payment.[24] Other state statutes expressly look only to the corporation's condition at the time the obligation is incurred.[25]

The decisions reading state statutes to require surplus to be sufficient at the time payment is due can be misinterpreted. They do not necessarily mean the court would grant the claimant parity with general creditors if the statute required surplus to be sufficient only at the time of the purchase. The courts may have intended to apply the state surplus test merely as a preliminary step. In some of these decisions, the courts imply they would subordinate the redemption claim even if the state surplus test governed only the original purchase.[26]

Some decisions construe the applicable corporate statute to require only sufficient surplus at the time the obligation is incurred. In *In re Stern–Slegman–Prins Co.,*[27] for example, the statute permitted the "purchase" of a corporation's own shares, provided capital would not be impaired. The court concluded the statute applied only to the initial purchase, and declined to subordinate the debt in the corporation's subsequent bankruptcy.

Massachusetts has no statute requiring that the price of a stock redemption not exceed the corporation's surplus. Indeed, there is no Massachusetts statute expressly authorizing stock redemption. Massachusetts does, however, have statutes imposing liability upon stockholders and directors for redemptions made when the corporation is insolvent or which render the corporation insolvent.

The statute imposing liability upon stockholders impliedly grants a defense against payment of redemption debt if the statute's insolvency test is not met. It reads in pertinent part:

> Stockholders to whom a corporation makes any distribution, whether by way of dividend, repurchase or redemption of stock, or otherwise, except a distribution of stock of the corporation, if the corporation is, or is thereby rendered insolvent shall be liable to the corporation for the amount of such distribution made, or for the amount of such distribution which exceeds that which could have been made without rendering the corporation insolvent, but in either event, only to the extent of the amount paid or distributed to them respectively. . . .

Mass.Gen.L. ch. 156B, § 45.

The statute imposing liability upon directors is similar. It provides:

> If the corporation is insolvent or is rendered insolvent by any such distribution [whether by way of a dividend, repurchase or redemption of stock, or otherwise, except a distribution of stock of the corporation] . . . the directors who voted to authorize such distribution shall be jointly and severally liable to the corporation for the amount of such distribution made when the corporation is insolvent, or for the amount of such distribution which exceeds that which could have been made without rendering the corporation insolvent, but in

---

24. *Id.*

25. The MODEL BUSINESS CORP. ACT, and the many state statutes patterned after it, prohibits a "distribution" (defined to include delivery of a promissory note) if after the distribution the corporation would be insolvent in either the bankruptcy or equity sense. Redemption debt is expressly placed on a parity with other debt. *See* MODEL BUSINESS CORP ACT § 6.40 (1984), 1 MODEL BUSINESS CORP. ACT 474–75 (1988 & Supp.1991). The Delaware statute validates a redemption obligation if at the time the obligation was incurred the corporation's capital "was not then impaired or did not thereby become impaired." DEL.CODE ANN. tit. 8, § 160 (1986 & Supp.1994).

26. For example, in *LaGrand Steel Products Co. v. Goldberg (In re Poole, McGonigle & Dick, Inc.),*

796 F.2d 318, 322–23 (9th Cir.1986), the Ninth Circuit spoke of principles of equitable subordination and approved the line of decisions discussed earlier which subordinate redemption debt by reason of the debt's nature without regard to any state surplus test. In another case, in remanding for findings on the state surplus test, the court reserved decision on the "troublesome question whether equitable subordination of a former shareholder is appropriate even though local law permits the transaction and even though there was no fraud or overreaching." *Reiner v. Washington Plate Glass Co., Inc.,* 711 F.2d 414, 417 (D.C.Cir.1983).

27. 86 B.R. 994 (Bankr.W.D.Mo.1988).

either event only to the extent such distribution, or such excess, is not repaid to the corporation. In no event shall the directors who authorized any such distribution be liable under this section if such distribution could have been made without ... rendering the corporation insolvent at the time when such distribution was authorized, although subsequent payment of such distribution or any part thereof· causes such ... insolvency.

Mass.Gen.L. ch. 156B, § 61.

The stockholder statute is opaque on whether in a redemption for a promissory note the "distribution" is the note or the payments under it. The statute imposing liability on directors, on the other hand, distinguishes between (i) a "distribution" which "could have been made" without insolvency when it was "authorized," and (ii) subsequent "payment of such distribution" causing insolvency. In this context, the phrase "subsequent payment of such distribution" would seem to include payment under a promissory note. This second sentence was added in 1980.[28] Legislative history is lacking.

It is possible to conclude from the distinction section 61 makes between "payment" and "distribution" that "distribution" in section 45 on stockholder liability refers only to delivery of the promissory note, so that the corporation's insolvency at the time payment is due is immaterial to enforcement of the note. But considerations concerning director liability are different from those relevant to stockholder liability. There is obvious unfairness in imposing liability upon directors who authorized a redemption that posed no threat to the corporation's financial health at the time of authorization. There is fairness, in contrast, in subordinating what is essentially a claim to a dividend when the corporation becomes insolvent. The Massachusetts legislature was apparently only concerned with the plight of directors. Its failure to make an equivalent amendment protecting

the note payment rights of former stockholders could even be taken as an indication that the legislature intended to impose liability upon them if they are paid after the corporation's insolvency, so that an insolvent corporation would have a defense to the claim prior to payment. But these are speculations. In the final analysis, the statute is ambiguous.

No reported decision has resolved this ambiguity. In *Brigham v. M.J. Corp.*,[29] the Supreme Judicial Court of Massachusetts did nothing more than recognize the uncertainty of when insolvency was relevant under the former version of section 61.

There are, however, Massachusetts redemption cases decided before the present statutory framework. Section 45 was enacted in 1964.[30] Prior to then, the Massachusetts corporation statutes contained no section imposing liability upon stockholders for distributions made to them. They prohibited amendment of a corporation's charter to reduce its authorized capital stock during insolvency and imposed liability upon stockholders for debts existing at the time of any prohibited reduction.[31] Directors were made liable for declaring a "dividend" if the corporation was insolvent or was thereby rendered insolvent, but there was no mention of stock redemptions.[32]

*Barrett v. W.A. Webster Lumber Co.*[33] was decided in that era. The plaintiff, a preferred stockholder, sought to restrain the defendant from enforcing the corporation's note given to the defendant in redemption of the defendant's stock. The corporation was solvent at the time of the redemption. It then had assets whose value exceeded all its liabilities (including the defendant's note) plus the stated capital of preferred stock, but the asset values did not exceed liabilities plus stated capital of preferred and common stock taken together. The corporation was then unable to pay its current liabilities as they

**28.** 1980 Mass. Acts 265.

**29.** 352 Mass. 674, 679–80, 227 N.E.2d 915, 919–20 (1967).

**30.** 1964 Mass. Acts 723, § 1.

**31.** *See* Mass.Gen.L. ch. 156B, §§ 35, 45 (*repealed* 1964 Mass. Acts 723, § 1).

**32.** *See* Mass.Gen.L. ch. 156B, § 37 (*repealed* 1964 Mass. Acts of 723, § 1).

**33.** 275 Mass. 302, 175 N.E. 765 (1931).

became due. At the time of suit, the value of the corporation's assets was less than its liabilities, and it was attempting to settle with its creditors at 75 cents on the dollar.

The court in *Barrett* said it regarded the question to be whether the initial redemption was invalid because the company's liabilities plus its capital exceeded the value of its assets, even though asset values then exceeded all liabilities. Continuing to focus only on the company's financial condition at the time of the redemption, the court emphasized the company could then pay all its debts plus all preferred stockholders, including the plaintiff, and that the decline in its asset values could not have been reasonably anticipated. The latter observation seems questionable in view of the company's inability to pay its current liabilities at the time of the redemption. Rejecting the contention that a corporation can purchase its stock only out of surplus, the court ruled the redemption had violated no rights of the plaintiff as a preferred stockholder. The court affirmed the lower court's denial of the requested injunction against payment of the defendant's redemption notes.

*Barrett* was concerned with the rights of a preferred stockholder, not a creditor. The court seemed to acknowledge the rights of creditors to complain about a redemption. It said: "[T]he great weight of authority holds that a corporation may buy its own stock if the purchase is made in good faith and does not prejudice the rights of creditors." [34]

The rights of a creditor were present in *Scriggins v. Thomas Dalby Co.*,[35] decided a few years later. A creditor brought suit to enjoin the defendant from enforcing payment of notes given to the defendant in redemption of his stock. The corporation was solvent at the time of the redemption, but it was not shown that its surplus then exceeded the redemption price. The corporation was also solvent when the payee brought two actions on the notes. But it had become insolvent by the time of trial of those actions, which were consolidated with the creditor's suit for the injunction.

The *Scriggins* court affirmed the propriety of redemption for a price in excess of surplus, as well as the ability of a corporation to purchase its own stock "if creditors would not be prejudiced." [36] The creditor argued that an implied term of the redemption contract was that the contract would not be carried out if at the time fixed for performance the corporation was insolvent or performance would render the corporation insolvent. Stating it did not decide this point, the court ruled that even assuming the proposition to be so, it had no application to the case because the corporation was solvent when the notes in question matured and when suit on them was brought. The court then said: "Changes thereafter in the financial condition of the corporation did not affect the enforceability as a matter of law of the matured obligations upon which these actions were brought." [37] From what the court had said previously, one would interpret this sentence to mean merely that the rights of parties are fixed as of the time of commencement of suit. But as authority for the statement, the court cites the *Barrett* decision, which had focussed entirely on the corporation's condition at the time it incurred the redemption debt.

In summary, Massachusetts cases decided prior to the passage of section 45 are as ambiguous as section 45 is on the question of whether the corporation must be solvent at the time the payment in question is due. There are intimations in *Scriggins* that solvency is required at the time of payment, but the court's meaning is uncertain, due in no small measure to its citation of *Barrett*. All that can be said with certainty is that in *Scriggins* the court declined to rule on the question, just as it later declined to do in *Brigham*.

It is nevertheless my obligation to attempt to predict how the Supreme Judicial Court of Massachusetts would rule.[38] I conclude from *Barrett* and *Scriggins* the court would inter-

**34.** 275 Mass. at 307, 175 N.E. at 768.

**35.** 290 Mass. 414, 195 N.E. 749 (1935).

**36.** 290 Mass. at 420, 195 N.E. at 752.

**37.** 290 Mass. at 421, 195 N.E. at 753.

**38.** *In re Miller*, 113 B.R. 98, 101 (Bankr.D.Mass. 1990).

pret section 45 not to impose liability upon a stockholder for having received, when the corporation is insolvent, payment under a redemption note delivered when the corporation was solvent. It follows that the court would not require current solvency for enforcement of the obligation. The claim would therefore stand in parity with other debt outside of bankruptcy.

## IV. SUPREMACY OF SECTION 510(c) OF BANKRUPTCY CODE

■ Section 510(c) of the Bankruptcy Code must nevertheless control. Congress enacted it in the exercise of its constitutional authority "[t]o establish ... uniform laws on the subject of bankruptcies throughout the United States."[39] Under the Supremacy Clause, the "Constitution, and the laws of the United States which shall be made in Pursuance thereof ... shall be the Supreme Law of the land ... any Thing in the Constitution or laws of any state to the contrary notwithstanding."[40]

■ Application of the Supremacy Clause requires suspension of a state insolvency law so long as federal bankruptcy legislation is in effect.[41] The Supreme Judicial Court of Massachusetts has accordingly declared the Massachusetts insolvency law to be suspended.[42]

■ The Supremacy Clause requires more than denial of a state's ability to enact comprehensive insolvency legislation. Ever since Gibbons v. Ogden,[43] the Supremacy Clause has rendered invalid state laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the Constitution."[44] The question is whether the state statute in question "stands as an obstacle to the accomplishment and execution of the full purposes of Congress."[45]

In Perez v. Campbell,[46] the Supreme Court interpreted the Supremacy Clause to require invalidation of a state statute which suspended an individual's driver's license and car registration for nonpayment of a judgment arising from a motor vehicle accident, even though the judgment liability had been discharged in bankruptcy. The Court struck the statute down because of its conflict with the debtor's discharge in bankruptcy, the embodiment of the fresh start policy of bankruptcy law. In response to the argument that the purpose of the law was to promote highway safety, the Court ruled the effect of the law and not its purpose is relevant.

Section 45 of chapter 156B of the Massachusetts General Laws, as I believe it would be interpreted by the Supreme Judicial Court of Massachusetts, is in direct conflict with section 510(c) of the Bankruptcy Code. Section 510(c) requires subordination of this claim to all unsecured claims. Application of section 45 would give the claim parity with all unsecured claims. Section 510(c) is based upon the bankruptcy policy favoring a fair distribution to creditors, a policy as basic as the fresh start policy before the Court in Perez. The conflict is similar to that present when a state statute requires payment of state taxes as a condition to issuance of a liquor license. Bankruptcy court decisions in this district have invalidated application of such statutes to Code debtors because of their conflict with the priority scheme of the Bankruptcy Code.[47]

Under the teaching of Perez, it makes no difference that the purpose of section 45 may be to promote certainty in the enforcement of a contract reflecting a significant business

39. U.S. CONST., art. I, § 8.

40. U.S. CONST., art. VI.

41. International Shoe Co. v. Pinkus, 278 U.S. 261, 49 S.Ct. 108, 73 L.Ed. 318 (1929).

42. Goldstein v. Columbia Diamond Ring Co., 366 Mass. 835, 323 N.E.2d 344 (1975).

43. 22 U.S. 1 (Wheat), 6 L.Ed. 23 (1824).

44. Id. at 211.

45. Perez v. Campbell, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971); Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

46. 402 U.S. 637, 91 S.Ct. 1704 (1971).

47. In re Kick–Off, Inc., 82 B.R. 648 (Bankr. D.Mass.1987), aff'd, 1988 WL 123927 (D.Mass. 1988); Aegean Fare, Inc. v. Licensing Board for City of Boston (In re Aegean Fare, Inc.), 35 B.R. 923 (Bankr.D.Mass.1983).

transaction. It is enough that the effect of the statute's application is to conflict with federal law.

A separate order has issued subordinating the claim.